(No. 15736.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN P. LOONEY *et al.*—(HARRY M. SCHRIVER *et al.* Plaintiffs in Error.)

*Opinion filed October 28, 1924—Rehearing denied Dec. 3, 1924.*

1. CRIMINAL LAW—*Attorney General may assist in prosecution.* Under the act in regard to Attorneys General and State's attorneys, the Attorney General is authorized to appear not only for consultation and advice but to give whatever assistance may be desirable and beneficial to the prosecution, both during the trial and in all preliminary and subsequent proceedings arising in the progress of the case.

2. SAME—*prosecution is not required to disclose source of funds to pay expenses of proceedings.* A defendant charged with crime cannot call upon the State's attorney or Attorney General to disclose the source from which the funds are derived to pay the expenses of investigating and prosecuting him in particular or crime in general.

3. SAME—*private subscription of funds to prosecute crime is not contrary to public policy.* There is no rule which declares the private subscription of funds for the prevention, discovery or prosecution of crime to be contrary to public policy.

4. SAME—*indictment cannot be quashed because of declarations of public sentiment.* An indictment cannot be quashed because of public sentiment in the community or of public excitement because open crime has been committed and gone unpunished, or because newspapers or individuals or associations have denounced crime or individuals charged with crime.

5. SAME—*grand juror cannot be challenged because of opinion as to prisoner's guilt.* It is not a ground of challenge of a grand juror that he has formed and expressed an opinion as to the guilt of a prisoner.

6. SAME—*competency of evidence or of witnesses before grand jury will not be considered unless all witnesses were incompetent.* A court will not inquire into the competency of evidence or of witnesses before a grand jury or the sufficiency of the evidence to justify an indictment unless all the witnesses were incompetent.

7. SAME—*Attorney General may appear and assist State's attorney before grand jury.* The Attorney General, by his assistants, is authorized to appear before the grand jury and assist the State's attorney in the investigation of the charges of an indictment.

8. SAME—*what evidence is relevant to prove charges of indict-ment for conspiracy.* Although an indictment charging public offi-cers and others with conspiracy refers only to a conspiracy as to furnishing certain gambling houses with punch-boards, yet if the different counts of the indictment vary in the statement of the purposes of the conspiracy, one charging such purposes to be to refrain from arresting and prosecuting the keepers of gambling and disorderly houses and to protect them from molestation, any evi-dence which has a tendency to prove such charges is competent, even though it refers to occurrences after the operation of the punch-boards had ceased and which had no connection with the placing of the punch-boards.

9. SAME—*what is not a waiver of objection to parts of exhibit admitted in evidence.* In a prosecution of public officers and others for conspiracy to protect certain offenders, where the defendants have made a general objection to the admission in evidence of a certain newspaper, reserving the right to make particular objection, and the court overrules the general objection and allows portions of the exhibit to be read to the jury, the making of objection to certain parts of the exhibit is not a waiver of the objection to the admissibility of the other parts.

10. SAME—*when weapons found in the office or home of co-con-spirator are not admissible.* Weapons found in the office or home of one who was jointly indicted with other defendants with con-spiracy to protect the keepers of gambling and disorderly houses are not admissible in evidence where they have no connection with the charge in the indictment and have no tendency to prove the charge or any act in relation to the conspiracy.

11. SAME—*what evidence of conversation is admissible to prove conspiracy.* In a prosecution of public officers and others for con-spiracy to furnish the keepers of gambling and disorderly houses with punch-boards and to protect them from arrest, a witness may testify to conversations he had with one of the defendants, who was the chief of police, in regard to permitting witness to keep a house of prostitution, and to said defendant's frequent visits to the house of a prostitute who was formerly the witness' wife, and as to the defendant's relations with her, as such evidence has a tend-ency to show the defendant's knowledge and intent.

12. SAME—*when evidence as to homicide is not admissible to prove conspiracy.* In a prosecution of public officers and others for conspiracy to protect the keepers of gambling and disorderly houses, evidence of the killing of a certain saloon-keeper and of checks by which he had made more or less regular payments to a certain party is not admissible, where there is no evidence con-

necting the defendants with the killing or the payments made by the victim.

13. SAME—*when instruction based on count charging conspiracy to receive bribes is improper.* An instruction based upon a count charging conspiracy of public officers and others to receive bribes for the purpose of furnishing certain gambling houses with punch-boards and to protect the keepers thereof from arrest, should not authorize the jury to find the defendants guilty upon proof, not of the receipt of bribes but of conspiring to use official power for certain unlawful purposes, without reference to the receipt of bribes, and should not authorize the finding of the defendants guilty "of any of said conspiracies," as only one conspiracy is charged in the count referred to.

WRIT OF ERROR to the Circuit Court of Rock Island county; the Hon. HARRY EDWARDS, Judge, presiding.

KENWORTHY, DIETZ, SHALLBERG, HARPER & SINNETT, W. C. ALLEN, and P. R. INGELSON, (C. E. DIETZ, and J. J. NEIGER, of counsel,) for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, BEN S. BELL, State's Attorney, and EDWARD C. FITCH, (CHARLES W. HADLEY, JAMES J. BARBOUR, and GEORGE W. WOOD, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

At the January term, 1923, of the circuit court of Rock Island county an indictment was returned against John P. Looney, Harry M. Schriver, John K. Scott, Thomas Cox, Lawrence Pedigo and Robert Kinner for conspiracy to furnish punch-boards and other gaming devices to divers persons and divers keepers of houses of prostitution and to protect them from arrest and keep them free from police molestation while they were engaged in the city of Rock Island in the keeping, maintenance and operation of such gaming devices, saloons, gaming houses and houses of prostitution. Looney was not arrested, Kinner was granted a severance and the cause was continued as to Scott. The

other defendants, Schriver, Cox and Pedigo, were tried at the term the indictment was returned and convicted, and are prosecuting a writ of error to reverse the judgment.

The Attorney General, by his assistants, appeared before the grand jury while it was investigating the charges upon which the indictment was returned, and after its return represented the People as well in the motions made preliminary to the trial before the jury as in that trial itself. The plaintiffs in error made a motion to quash the indictment and also objected to the appearance of the Attorney General and his assistants, making a motion that they be required to show by what authority they appeared for the People. The motion to quash was based chiefly on the participation of the Attorney General in the proceedings before the grand jury. Both motions were denied and the denial of them is among the errors assigned. Since the act in regard to Attorneys General and State's attorneys expressly authorizes the Attorney General to advise the several State's attorneys in matters relating to the duties of their office, and, when in his judgment the interest of the people of the State requires it, to attend the trial of any party accused of crime and assist in the prosecution, there is no basis for an objection by a defendant to the appearance of the Attorney General after the return of the indictment. The trial referred to is not merely the proceedings beginning with the empaneling of the jury and ending with the verdict, but includes all the preliminary and subsequent proceedings arising in the progress of the case. It is not only the duty of the Attorney General in the case specified in the statute to attend the trial before the jury but to assist in the prosecution. His services are not limited to consultations and advice, but include whatever assistance may be desirable and beneficial to the prosecution. Since there are a hundred and two counties in the State and courts are in session at the same time in many of them, the Attorney General cannot be present in person in all of them and must

necessarily be represented, at times, by his assistants. The State's attorney made no objection to the appearance of the Attorney General or any act of his in the case. He was satisfied to accept his assistance. If the State's attorney, without objection, permits the Attorney General to appear in court assisting in the prosecution of one accused of crime, it certainly does not lie in the mouth of the defendant to object. The record shows the appearance of both the State's attorney and the Attorney General, and neither was under any obligation to show any authority for his appearance.

Much space is taken up in the record, and more in the briefs, with the question of the right of the Attorney General to appear before the grand jury. The statements in the motion to quash were sworn to on information and belief by one of the plaintiffs in error and did not prove anything as to what took place in the presence of the grand jury. The report of the grand jury of the previous term, referring to crime conditions in Rock Island, was introduced in evidence on the hearing of the motion, as were several newspaper articles on the same subject which had been circulated widely before the grand jury met and during its session. It was shown that a citizen's committee had raised by popular subscription a fund of $35,000 "to clean up Rock Island," to be used in paying expenses in connection with the investigation and prosecution of crime, and it was claimed that the Attorney General's assistants were to be paid out of this fund. These assistants testified on the hearing of the motion that they represented the Attorney General, only, and looked to him for their compensation. Objections to questions asked as to the source of the Attorney General's funds were sustained. Such questions were incompetent. Whether the assistant attorneys general were paid or not paid was immaterial. A defendant charged with crime cannot call upon the State's attorney or Attorney General to disclose the source from which the funds required to pay the expenses of investigating and

prosecuting him in particular or crime in general are de-
rived. There is no rule which declares the private subscrip-
tion of funds for the prevention, discovery or prosecution
of crime to be contrary to public policy. It needs not to
be said that neither the State's attorney nor the Attorney
General may receive any private funds for his own use,
either as compensation or for personal expenses, and noth-
ing of the kind is claimed to have occurred.

An indictment cannot be quashed because of public sen-
timent in the community or of public excitement because
open crime has been committed and gone unpunished or
because newspapers or individuals or associations have de-
nounced crime or individuals charged with crime. A grand
jury is an accusatory body. It does not try persons charged
with crime. It only investigates, and if sufficient criminat-
ing evidence is presented makes accusation, which is an in-
dictment. So it is not a ground of challenge of a grand
juror that he has formed and expressed an opinion as to
the guilt of a prisoner. (*Musick* v. *People,* 40 Ill. 268.)
Our statute authorizes the grand jury to make presentments
upon the information of not less than two of their own
number without the necessity of their being sworn and to
find indictments upon the sworn testimony of one member,
the same as in the case of other witnesses. An opinion
of the guilt of the prisoner, therefore, cannot be a ground
of challenge. Neither will a court inquire into the compe-
tency of evidence or of witnesses before a grand jury or
the sufficiency of the evidence to justify an indictment un-
less all the witnesses were incompetent. *People* v. *Bladek,*
259 Ill. 69; *People* v. *Duncan,* 261 id. 339.

It is insisted, however, that the mere presence of the
Attorney General before the grand jury is a reason for
quashing the indictment. We have seen that the statute
gives the Attorney General authority to assist in the pros-
ecution. "Prosecute" and "prosecution" have been vari-
ously defined. It is said in 23 Am. & Eng. Ency. of Law,

(2d ed.) p. 268: "To prosecute is to proceed against judicially. A prosecution is the act of conducting or waging a proceeding in court; the means adopted to bring a supposed offender to justice and punish by due course of law. It is also defined as the institution or commencement and continuance of a criminal suit; the process of exhibiting formal charges against an offender before a legal tribunal and pursuing them to final judgment on behalf of the State or government, as by indictment or information." Cases are cited illustrating the various meanings with which the words are used upon different states of fact. This language has been approved in *State* v. *Bowles,* 70 Kan. 821. That was an indictment which was signed by the Attorney General of the State. A motion was made to quash the indictment on the ground that it was not signed by the prosecuting attorney of the county or any attorney authorized by law to sign indictments in the county. The code of criminal procedure required each indictment to be signed by the prosecuting attorney. This provision had been in force since 1858, but in 1861 the office of Attorney General was created, and it was provided that the Attorney General, whenever required by the Governor or either branch of the legislature, should appear for the State and prosecute or defend in any court or before any official in any cause or matter, civil or criminal, in which the State might be a party or interested. It was held that the language of this statute indicated that the intention was to grant plenary power to the Attorney General, and he was invested with full authority to use all the means afforded by the law to meet the requirements of any situation and fully protect the interests of the State, and that when directed by the Governor or either branch of the legislature to appear and prosecute criminal proceedings in any county, he became the prosecuting attorney of that county in those proceedings and had all the rights that any prosecuting official there might have, including those of appearing before the grand jury, signing

indictments and pursuing cases to final determination. A similar conclusion was reached in *People* v. *Gibson,* 53 Colo. 231, as to the right of the Attorney General to file an information in the name of the People for a felony and prosecute the action in the district court. The office of Attorney General was created by the constitution, and he was required to perform such duties as might be prescribed by the constitution or by law. By an act of the General Assembly of 1877 he was required to appear for the State, prosecute and defend all actions and proceedings, civil and criminal, in which the State should be a party or interested, when required to do so by the Governor or General Assembly. When this act became effective the method for prosecuting felonies was by means of an indictment, which the law required to be signed by the district attorney, who was required to appear in the courts of his district and prosecute in behalf of the People. "Such being the state of the law," the court said, "it is clear that when the legislature empowered the Attorney General to prosecute under certain conditions, that official, when the required conditions existed, could do each and every thing the district attorney might have done in the premises. Though the letter of the law required one official, alone, to do certain things, its spirit permitted another to do and perform the same or similar acts under certain conditions."

One of the duties of the Attorney General of Montana prescribed by statute was that he should, when required by the public service or directed by the Governor, assist the county attorney of any county in the discharge of his duties. The district court having denied the Attorney General the right to appear before the grand jury he applied to the Supreme Court for a writ of *certiorari* to determine whether the order of the district court judge was valid or void. In the case in the district court the Attorney General attempted to appear before and advise the grand jury and interrogate witnesses in regard to bribery charges made

by certain members of the legislature in connection with the senatorial election by the legislature, to which the judge of the district court had expressly directed the attention of the grand jury. In the opinion the court said: "Here we have a specific direction by which the Attorney General is to do more than to exercise those supervisory powers contemplated by previous requirements of the law. He is to assist the county attorney in the discharge of his duties when the public service requires it or when the Governor directs him to give such assistance. * * * Nor is there any limit whatever to the assistance to be given,—no point where it is to begin or to end, except the bound of the official duty of the county attorney. Just so long as the county attorney has a duty to discharge, and just so far as he may go in discharging it, so long is it the right and obligation of the Attorney General to actively assist him in the discharge of such a duty; and equally far in executing the duty shall he go when the public service requires it or when directed to assist by the Governor. * * * Circumstances sometimes demand that there shall not only be a supervisory action but an assistance to an inferior official as well, to the end that justice may be more certainly attained. When considerations of this nature move the Attorney General, or even when they do not move him, if the Governor is moved by them and directs him to exert his authority, he shall assist the county attorney, and must do so in the discharge of the duties which the county attorney is required by law to perform." *State* v. *District Court,* 22 Mont. 25.

It is unnecessary to discuss the common law powers of the Attorney General. He has the statutory power to assist the State's attorney. The State's attorney in this State has always exercised the power of calling witnesses and examining them before the grand jury, and this power is not now questioned by the plaintiffs in error. Neither is it denied that his assistant has the same power, for the

motion directed against the Attorney General and his assistants expressly excepted from its scope the State's attorney and his assistant.  While it is essential to the secrecy of the proceedings and the freedom and independence of judgment and action of the grand jurors that no unauthorized persons shall be present during the proceedings and no person during their deliberation and voting, the power of the State's attorney to be present and assist in the examination of witnesses has been recognized by implication, and it has been expressly decided that the appearance of an attorney employed by private persons before the grand jury and the examination of witnesses by him, when he is not present during their deliberation on the evidence and does not attempt to influence their action, is not ground for quashing an indictment.  (*People* v. *Hartenbower*, 283 Ill. 591.)  There is a conflict in the decisions as to the effect of the appearance of private attorneys before the grand jury, influenced to some extent by varying statutory provisions, but the case last cited declares the rule in this State. In this case, however, no private attorney appeared before the grand jury, but the Attorney General of the State assisting the State's attorney pursuant to statutory authority, and his action was clearly proper.

There were three counts in the indictment, the first of which charged that the defendants on November 15, 1921, conspired to do illegal acts injurious to the public police,— that is to say, then and there to unlawfully and knowingly offer for sale, sell, lease, loan and deliver to divers persons and divers keepers of gaming houses, punch-boards, being gambling devices used for the purpose of playing upon and winning and losing money and other articles of value.  The second count set out a number of ordinances of the city showing the distribution of official powers, the existence and duty of various officers and fixing penalties for various offenses.  It then averred that Harry M. Schriver was the mayor, Thomas Cox the chief of police, and John K.

Scott the city attorney; that certain persons (named severally) kept saloons and maintained gaming houses, and other persons (named severally) kept saloons and maintained gaming houses equipped with gambling devices, and in conjunction therewith also kept, maintained and operated houses of prostitution, and that upwards of 150 saloons, gaming houses and houses of prostitution were kept and operated in the city of Rock Island by divers other persons whose names were unknown to the grand jury; that the defendants conspired to sell, lease, loan, give, furnish and provide, for a corrupt consideration, gambling devices, to-wit, punch-boards, slot-machines, etc., to the named keepers of saloons, gaming houses and houses of prostitution and to divers other keepers, to the number of upwards of 150, contrary to the ordinances of the city and the laws of the State and in violation of the duties of the mayor, chief of police and city attorney to use the powers of the offices of mayor, chief of police and city attorney to coerce and require the keepers named, and divers other keepers of saloons, gambling houses and houses of prostitution, to purchase, lease, use, keep, maintain and operate gambling devices and share the profits and proceeds therefrom with the defendants, and to refrain from arresting such keepers and to protect the persons named and other keepers and keep them free from police molestation and attack while they were keeping, maintaining and operating said punch-boards, slot-machines, saloons, gambling houses and houses of prostitution, and to use the powers of their offices with corrupt partiality to the persons named and other keepers of saloons, gaming houses and houses of prostitution. The third count contained the same recitals as the second, and charged the defendants with conspiring to accept and receive bribes by them, said Schriver, Cox and Scott, to cause them to unlawfully and knowingly sell, lease, loan, give, furnish and provide divers gambling devices, to-wit, punch-boards and slot-machines, to keepers of gambling houses

and in their said offices to protect the keepers named in the use of such devices and to protect divers other keepers, in violation of the ordinances and laws and in violation of their duties as mayor, chief of police and city attorney, and for their own gain to use the powers of their offices for the same purposes mentioned in the second count.

Evidence was produced by the prosecution which tended to show that there were a large number of saloons, houses of prostitution and gaming houses in Rock Island; that John P. Looney had conducted there for some years a scandalous weekly paper, which by reason of its scandalous character and the methods which he adopted he had used successfully for purposes of intimidation, blackmail and levying tribute upon his victims. Cy Hazlett, a depraved person without character, reputation or shame, had worked on the paper as a reporter and writer and had written many of the scurrilous articles which appeared in the paper. His testimony and scandalous writings occupy a great part of the 3000 pages of the record. His wages were $15 a week, and he testified that in September, 1921, he told Looney he was not getting money enough. Looney told him the paper was not paying but he would see that Hazlett was either put into some poker game or something else where he could make money. Later Looney said he had arranged to get Hazlett the exclusive punch-board concession for Rock Island. They had a talk as to how the proceeds were to be distributed, and it was agreed that Hazlett should have twenty-five per cent, the defendant Pedigo (who was to be associated with him) twenty-five per cent and Looney fifty per cent. Looney said that John K. Scott, city attorney, and Tom Cox, chief of police, were to be in on his fifty per cent. Hazlett and Pedigo put punch-boards in many of the saloons and gaming houses in the fall of 1921 and collected from the keepers the proportion which they fixed as their share of the profits. Where punch-boards were already installed they told the keepers that Hazlett

314—11

had the exclusive punch-board privilege, and the punch-boards already in were taken out and Hazlett's installed in their stead. The installation of Hazlett's punch-boards began in October, 1921, and continued during November and December, but about January 1, 1922, they were all ordered taken out and the record contains no evidence that after that date any punch-boards were operated in Rock Island.

Although the purpose of the alleged conspiracy in regard to punch-boards had thus been carried out by January 1, 1922, much evidence was introduced by the prosecution, over the objection of the plaintiffs in error, of events occurring after that time for the assumed purpose of proving the plaintiffs in error guilty of a conspiracy to use their official powers to refrain from arresting and prosecuting the keepers of saloons, gaming houses and houses of prostitution who were named and other keepers whose names were unknown, and to protect, save and keep them free from police molestation and attack while they were engaged in keeping, maintaining and operating saloons, gaming houses and houses of prostitution, and to use their official powers with corrupt partiality to the persons named and other keepers of saloons, gaming houses and houses of prostitution. Evidence was introduced as to the existence, maintenance and operation of such places during the year 1922 with the knowledge of the plaintiff in error Cox, who was the chief of police; the use of police officers by Looney to make illegal arrests which he directed; the giving of a Ford car (which was in the custody of the police waiting to be claimed by its owner) to Looney, who sent it to his ranch in New Mexico; the public demand for the removal of Cox from office; the effort of the board of police commissioners to remove him and of the plaintiff in error Schriver to prevent his removal; the publication by Dan Drost of a rival paper, the *Tri-City Journal,* of the same character as Looney's paper, the *Rock Island News;* the murder of William Gabel on July 31, 1922, and of

John C. Looney, the son of John P. Looney, on October 6, 1922.

These matters were all gone into at length and in great detail, and it is claimed by the plaintiffs in error that they were all incompetent. They claim that the three counts of the indictment charge only a conspiracy in regard to the placing, maintenance, keeping, use and operation of punch-boards, and that the occurrences mentioned had no connection with any such purpose but all arose after the conspiracy in regard to punch-boards had accomplished its purpose and was no longer in existence. This construction of the indictment is incorrect. It is true that the indictment refers to only one conspiracy, and that conspiracy was with reference to punch-boards, but the three counts vary in the statement of the purposes of the conspiracy. Besides the purpose to place punch-boards in saloons and disorderly houses the second count goes into further detail, and charges, in substance, the purpose of the conspiracy to use the powers of the offices of mayor, chief of police and city attorney (1) to coerce the purchase and operation of punch-boards by the keepers of saloons and disorderly houses; (2) to refrain from arresting and prosecuting such keepers; (3) to protect, save and keep them harmless from molestation while engaged in keeping punch-boards, slot-machines, gaming devices, saloons, gaming houses and houses of prostitution; and (4) to use the powers of said offices with corrupt partiality to keepers of saloons, gaming houses and houses of prostitution. The third count charges as the purpose of the conspiracy the acceptance and receiving of bribes to induce the doing of the same things mentioned in the second count.

The object of the evidence of things occurring after January 1, 1922, and of other events having no connection with the placing of punch-boards, was to prove the charge that the defendants conspired to protect, save and keep free from police molestation and attack the keepers of saloons

and disorderly houses. Any evidence which had a tendency to prove this charge was competent. Early in the trial Cy Hazlett testified, over the defendants' objection, to several attempts to murder Dan Drost, which were participated in by Hazlett, John C. Looney, Frank Spangler and Pedigo according to Hazlett's testimony, but no connection was shown between these attempts and the conspiracy charged. Drost was not charged with being a conspirator and there was no evidence that he was. Hazlett gave as a reason for the attempts to kill Drost a remark which Drost made about John P. Looney's daughter which Looney would not tolerate, and Hazlett testified that John C. Looney spoke up and said, "I will fix him before I am through with him." The objection was made that these attempts were not connected with the charge against the plaintiffs in error, but the court overruled the objection, saying that if the connection was not shown the evidence would be stricken on motion. No evidence connecting these attempts with the charge against the plaintiffs in error was introduced, and the court at the close of the evidence overruled the motion of the defendants to exclude the evidence in regard to them.

The defendant in error contends that the motive for the attempts to kill Drost was not any remark about Looney's daughter but was hostility to Drost because of his publication of the *Tri-City Journal* with the avowed purpose of driving "the Rock Island vice syndicate and their blackmailing paper out of the tri-cities" and being after them "with both tooth and nail" until this is done. There is no contradiction of the evidence that the *Tri-City Journal* was not published until January 12, 1922, and that the attempts on Drost's life were in the fall of 1921. Parts of the *Tri-City Journal* itself, with its bitter vituperation and charges of blackmail, vice and crime, were admitted in evidence over the objection of the plaintiffs in error, though they were not evidence of anything in regard to this case but the malevolence of the publisher. It is argued on the part of

the defendant in error that the articles from the *Tri-City Journal* were not admitted over the objection of the plaintiffs in error, but that such part of the publication as was submitted to the jury was admitted by agreement of the parties. The record shows that when the *Tri-City Journal* was offered as People's Exhibit 1 a general objection was made to it, reserving the right to make a particular and special objection later, and the court stated that he thought it was better to hold the exhibit until the State rested and then pass upon the admissibility of all of it. When the State rested the defendants' counsel renewed the objection to Exhibit 1, but the court overruled the objection, stating that he thought some things proper to be read to the jury. The defendants then moved that certain parts be not read to the jury, and after discussion the court sustained the objection to parts of the exhibit and overruled it as to others. The defendants never waived their objection to the admissibility of any part of the exhibit. When the court overruled their general objection to the whole exhibit they objected to certain parts, but they did not thereby waive their objection to the admissibility of the other parts of the exhibit. The whole of it should have been rejected.

Two rifles, a double-barreled shot-gun, a revolver and some hand grenades which were in Looney's office in his residence were introduced in evidence. They were not admissible. They had no connection with the charge in the indictment and no tendency to prove the conspiracy charged or any act in relation to such conspiracy. The mere possession of fire-arms in Looney's home was not evidence against him.

Hazlett and L. C. Smith followed the plaintiff in error Cox and Helen VanDale one night in 1921 while they were riding in an automobile. She was the divorced wife of Smith, a prostitute and keeper of a house of prostitution. Smith also testified to conversations with Cox in regard to permitting him to keep a house of prostitution, and to Cox's

frequent visits to the house of Helen VanDale and his relations with her. It was not error to admit this evidence, which had a tendency to show Cox's knowledge and intent.

William Gabel was a saloon-keeper in Rock Island. He was murdered on the street in front of his saloon just before midnight on the night of July 31, 1922. There were no eye-witnesses of the murder, and evidence was offered by the prosecution, and admitted, of all the circumstances attending the homicide. R. C. Goss was the narcotic agent of the Federal government who had been investigating violations of the anti-narcotic law in Rock Island prior to June 30, when he went to Chicago. He came back to Rock Island on July 20 and remained there until after the murder of Gabel. He saw Gabel in his saloon and also at Goss' office in the post-office, and Gabel delivered to him nine checks. He was staying at the Como Hotel, and evidence was admitted that cars were going back and forth around the hotel on the afternoon and evening of July 31, patrolling the block. Counsel for the People assume in their brief that Looney and his son were causing these automobiles to patrol the block for the purpose of shadowing the Como Hotel, where Goss, Unger, Hazlett and Gabel were quartered. Albert H. Unger was a Federal prohibition agent who was at the Como Hotel on July 31, 1922, with Goss, and he testified that defendants Schriver and Cox came to Goss' room about four o'clock in the afternoon and talked with Goss in regard to an article in the *Rock Island Argus* newspaper relating to the conditions of vice in Rock Island. They asked Goss if he authorized the statement, and he said he did. They also asked Goss if he had anything on the police department of Rock Island, and he said he had not. Harry Prince, a prohibition agent, who had come to Rock Island that day to make investigations of violations of the liquor law in Rock Island, Davenport and other places, was also there. Unger saw John P. Looney about five o'clock in the evening opposite the Como

Hotel, on the east side of the street, standing on the corner talking to a man about twenty minutes. Looney's car was standing about twenty-five feet south of Looney. About six o'clock in the evening two dark touring cars were going back and forth alongside of the hotel for quite a long while, about three or four minutes apart. Quite a number of cars were parked opposite the hotel that afternoon. One closed car in particular, with four or five men in it, remained there quite a while, with curtains drawn. Evidence was admitted of the continuous passing of the two cars around the block. There was no evidence identifying the cars or any person in them. Shots were heard about midnight and immediately afterward Gabel was found lying in the street, dead. A physician was called, who testified in regard to his examination of the number and character of the wounds. Every detail of the homicide was introduced in evidence but there was no evidence which identified the perpetrators of the crime. The checks given by Gabel to Goss were also introduced in evidence. They were for various amounts, from $75 to $500, all signed "William C. Gabel," of various dates from March 23, 1921, to June 20, 1922, all payable to Louis Ortell but one, which was payable to the order of "cash," and all except that one were indorsed "Lou Ortell." Two also bore the indorsement "John Looney." On the back of the check payable to cash was the indorsement, "Ortell did not take this check on account of check; wanted cash.—Wm. C. Gabel." Evidence was also admitted that Prince, the Federal prohibition agent, was shot that same night in Davenport.

All this evidence was incompetent. There was nothing connecting the homicide, or any of the circumstances testified in connection with it, with the charge for which the plaintiffs in error were on trial. The counsel for the defendant in error argued that there was nothing improbable about the assumption that all this was Looney's work, because he was so much the ruler of Rock Island and so im-

mune from prosecution that he was able to do things openly and made no secret of his design to put Prince out of the way. It is argued that Ortell was Looney's chief lieutenant in the bootlegging business and that the circumstances satisfactorily show that the checks were given by Gabel as protection money to Ortell. These things may all be true, but there is no evidence of them and they are founded solely on imagination. There is no evidence as to who killed Gabel, no identification of anyone engaged in the automobile patrol of the block or identification of any one of the cars.. There is no evidence about the consideration of the checks given to Ortell. It may have been money borrowed, it may have been whisky, it may have been protection, or it may have been something different from any of these. The theory that any one of the plaintiffs in error was involved in the Gabel murder rests wholly on conjecture. The circumstances are suspicious but nothing more, and it was error to admit the evidence in regard to this homicide and the checks.

It was also error to admit the evidence in regard to the murder of John C. Looney on October 6, 1922. No connection of the defendants was shown with it. Other evidence to which objections were made was also improperly admitted, but in view of what has been stated it is unnecessary to discuss the objections in detail.

Error is assigned on the giving and refusing of instructions. Instruction 12 advises the jury as to the third count of the indictment, that this count charges a conspiracy to receive bribes for the purpose of causing the mayor, chief of police and city attorney to furnish punch-boards to keepers of gambling houses and for the further purpose of doing the other acts mentioned in that count, in violation of their official duties. The instruction then charges that if the jury believe from the evidence under that count, beyond all reasonable doubt, that any two of the persons charged in that count conspired, combined and agreed to-

gether that Harry M. Schriver, mayor, Thomas Cox, chief of police, and John K. Scott, city attorney, or any one of said officers, should use their official powers for the corrupt purposes mentioned in that count, the jury should find the defendant or defendants whom the proof shows beyond all reasonable doubt guilty of such conspiracy, guilty. The instruction informed the jury that the count charged a conspiracy to receive bribes as an inducement to use official power for certain unlawful purposes, and it authorized conviction without the proof of any conspiracy to receive bribes but upon proof of a conspiracy to use the official powers of the officers mentioned, corruptly and for their own gain, without reference to receiving bribes. In the language, "if you believe from the evidence under the count, beyond all reasonable doubt, that any two or more of the parties charged in the count were guilty of any of said conspiracies," the instruction assumes that the count charges more than one conspiracy, though the instruction itself previously states that the count charges a single conspiracy to receive bribes. The various purposes for which it is alleged the bribes were to be received are not stated as conspiracies to do those things, but are all dependent upon the one conspiracy to receive bribes for the several purposes. The instruction was wrong, not only because it authorized a conviction on this count without proof of any conspiracy to receive bribes, but also because there was no proof in the record of a conspiracy to receive bribes.

Objection is made to other instructions given on behalf of the People, but the criticism made of them is not of such a character as to require further discussion, in view of what we have said.

Objection is also made to the refusal of a number of instructions asked on behalf of the plaintiffs in error. A great number of instructions were asked by the defendants, less than half of which were given, but enough were given to inform the jury fairly as to the questions of law arising

in the case, and while some of the instructions refused state correct principles of law, so far as they were applicable to the case they were contained in other instructions which were given.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*