THE PEOPLE *ex rel.* The Rock Island County Bar Association, Relator, *vs.* HARRY M. McCASKRIN, Respondent.

*Opinion filed April 20, 1927.*

DISBARMENT—*attorney will be disbarred only on clear and satisfactory proof of misconduct alleged.* To warrant disbarment of an attorney there must be clear and satisfactory proof of unprofessional, dishonorable or criminal conduct and the case must be free from doubt, not only as to the act charged but as to the motive with which it was done, and the attorney can be tried only on the specific charges against him in the information.

THOMPSON, J., took no part.

INFORMATION to disbar.

JOHN L. FOGLE, and JAMES J. BARBOUR, for relator.

HARRY M. McCASKRIN, *pro se.*

Mr. JUSTICE HEARD delivered the opinion of the court:

Respondent, Harry M. McCaskrin, was admitted to the practice of law in this State in July, 1896, since which time he has been engaged in the practice of his profession for many years in Rock Island and Moline, in Rock Island county. He was elected as a representative in the General Assembly in 1920, which office he has continued to hold to the present time. Upon an information filed by relator by leave of this court he was ruled to show cause why his name should not be stricken from the roll of attorneys and

counselors at law of this State. He filed an answer to the information denying the charges contained therein, and the matter was referred to a commissioner to take proofs and report the same to this court. Proofs having been taken and the commissioner's report filed, the cause is now before this court for hearing upon a motion of relator that the rule be made absolute.

The information as presented to this court contained eleven counts, of which the first, second, third, eighth, ninth, tenth and eleventh were allowed to be filed. The tenth has now been abandoned by relator. The first, second and third counts are more or less connected and will be considered together.

The first count charges respondent with preparing, writing and publishing in the *Rock Island News* certain libelous and defamatory articles concerning J. L. Vernon, with the purpose of exposing him to public hatred, contempt, ridicule and financial injury and unlawfully obtaining money, goods and chattels from him. These articles are set out in full in the information, and one of them was published in the *Rock Island News* on October 15, 1921, three on October 22, 1921, two on October 29, 1921, and one on November 15, 1922.

The second count charges extortion by threats, by writing and publishing the articles mentioned in the first count, and endeavoring to prevail on Vernon to pay respondent and Mary Smith $40,000 to prevent exposure and publicity concerning Vernon and his association with and alleged mistreatment of Mary Smith, and by threatening to prosecute Vernon on behalf of Mary Smith in the circuit court of Rock Island county, and that he and John Looney obtained thereby $20,000 from Vernon.

The third count charges that respondent was guilty of unprofessional conduct by making use of the circuit court of Rock Island county for the purpose of practicing extortion and levying blackmail by beginning a suit in the name

of Mary Smith against Vernon for the purpose of coercing
him into paying $40,000 to prevent further publicity in the
*Rock Island News* as to the charges contained in the decla-
ration filed in the suit.

In 1922, and for several years prior thereto, the *Rock
Island News,* a scurrilous, sensational paper, was published
in Rock Island and is alleged to have been used by its
owner and publisher, John P. Looney, alleged head of a
vice and graft ring in Rock Island, (*People* v. *Looney,*
314 Ill. 150; *People* v. *Billburg,* 314 id. 182; *People* v.
*Looney,* 324 id. 375;) largely as an instrumentality for
blackmailing purposes.     James L. Vernon, a resident of
Rock Island, in October, 1921, was president and acting
head of the People's National Bank and of the American
Trust and Savings Bank.     He was also a member of the
Rock Island board of education and president of the cor-
porations operating the two largest department stores in
Rock Island.     His family consisted of his wife, three sons
and two daughters.     He had been acquainted with Mrs.
Mary Smith for some time.     She was at one time cashier
in the restaurant that he and other business men fre-
quented at the lunch hour.     She was a widow and had ob-
tained some money as damages for the death of her first
husband and was a depositor in the Vernon bank.     At the
time she was cashier in the restaurant she was in ill-health,
troubled with some injury of the shinbone, and had had
many operations on it.     She consulted Vernon at the bank
about her affairs, and he advised her to go to Mayo Bros.'
Sanitarium, at Rochester, to ascertain her trouble.     The rec-
ord shows that she made an investment or two of the money
that she had received from her husband's estate, advising
with the bank officials as to those transactions.     Mrs. Smith
had later worked in the Peterson store, in Davenport, which
was the largest department store in the tri-cities.

Vernon testified that he had Mrs. Smith do some inves-
tigative work for him in connection with his department

stores in the nature of secret service; that this was in connection with store problems having to do with the loss and purloining of merchandise by employees or others and keeping in touch with competing stores as to prices charged, the character of merchandise on sale, and other features of the competitive business, especially with reference to special sales when they were advertised, and kindred matters; that there was no special salary paid to Mrs. Smith for that service, but he gave her money from time to time as the services were rendered; that she was residing in the west end of Davenport, and he went to see her, usually at her home, with reference to this investigative work that she was doing; that he met her in Davenport on October 6, 1921, in response to a telephone call from her at his office late in the afternoon, wherein she told him that she was leaving the city and had something very important to see him about before she left and asked him to come there and see her. Just prior to six o'clock he drove over to Davenport in his Ford coupe and met her on the street and rode with her until a little after nine o'clock, when a violent altercation ensued between them as to their future relations, during which she was seriously injured either by being thrown violently against the curb when he suddenly started the machine when she was attempting to enter it, as testified by him, or by reason of his losing his temper, striking her and slamming the car door upon her leg as he was attempting to throw her from the car, as claimed by her. Then there was more talk and she asked him to take her home. He refused, locked the machine, got out and boarded a street car and went home, leaving her there in his car, taking the car keys with him. This was between 9:30 and 10:00 o'clock in the evening.

Respondent testified that he had been slightly acquainted with Mrs. Smith since 1912 or 1913, and that two years before October, 1921, he had looked up a case for her; that he knew her as Mary DeBord; that about ten o'clock in

the evening of October 6, 1921, he was called upon the telephone by a person who gave the name of Mary Smith; that he did not recognize the name; that she told him she was Mary DeBord, who had worked in the Crown restaurant, and that she was now married to Smith; that she said she would like to have him come to Davenport right away, as she was very badly injured and could not tell him over the telephone; that she sent a taxicab for him and he went over; that when he got there she said that Vernon had struck her and almost killed her; that she thought her right leg was broken; that Vernon's Ford coupe was standing there by the curb, and she said that he had left her there and that she had waited a long time for him to come back, and that after he had not done so she had made up her mind to call respondent; that when respondent saw her condition he told her that she needed a doctor and not an attorney; that he helped her to get into the taxicab and took her to 1029 Ash street, where she said she was living; that he got a doctor for her that night; that he searched the Ford car and got a reporter for the *Davenport Democrat,* who was standing there, to help push it into the People's Power Company's garage; that the next morning about nine o'clock he went to the bank to see Vernon.

With reference to this interview Vernon testified that respondent said he was a good friend and brother Mason; that he had been called by Mrs. Smith from Davenport about eleven o'clock the night before; that it was a regrettable occurrence and something ought to be done about it. He suggested, first of all, witness getting the car; that he had found it locked and could not run it, and that it had been pushed into a building alongside of which it was standing; that witness suggested that respondent get the car, and gave him the keys with the understanding that he was going to get it; that he talked about Mrs. Smith being injured and all that sort of thing; that it was not gone into very much at that time; that respondent said

he thought she seemed to be excited and hysterical, but if
witness would go over and talk to her the whole thing could
be readily adjusted. Respondent's version of this interview
is practically the same, except that in addition thereto he
testified that Vernon, in talking about the altercation, said
that he thought she had a gun in her bag and that he tried
to take the bag away from her and that in the scuffle over
the bag he lost his head and struck her; that he didn't know
the car door was open and she went backwards out of it
and he undertook to slam the door to get away from there;
that when he did that he slammed the door on her leg and
she screamed and he was afraid somebody had heard them;
that he jumped out of the car and put her back in it, and
just then a Bridge Line car came along going to Rock Is-
land and he ran and caught it. Vernon did not deny these
statements of respondent.

After the interview with Vernon, respondent, accom-
panied by one Kelly, a lawyer, and Flannigan, a constable,
went to Davenport, got Vernon's car and went to see Mrs.
Smith. They found her lying on the bed. She exhibited
to them her wounds and bruises and told them the same
story as to their reception that she had told respondent the
night before. Respondent, Flannigan and Kelly testified
that she asked respondent to act as her attorney in the mat-
ter and that he declined; that she was informed that Kelly
was a lawyer, and that he, at her request, consented to act
in that capacity. A few days later Mrs. Smith came to
Rock Island and a written contract was entered into by
her and Kelly, by which Kelly agreed to act as her attor-
ney in the matter for a fifty per cent contingent fee. Re-
spondent was called in, and at the request of Kelly and
Mrs. Smith a declaration, to be filed if suit was brought,
was prepared by respondent from statements there made
by her as to the assault on October 6, 1921, and a previous
assault on August 31, 1921.

On October 15, 1921, in response to a telephone call from Kelly, Vernon went to Kelly's office and had an interview with him, at which Flannigan and respondent were present. Vernon was told that Mrs. Smith claimed to be in a very serious condition and that she was asking $20,000 damages. In that conversation no threat was made against Vernon other than that suit would be brought if he did not see Mrs. Smith at once and settle with her. The sum of $20,000 was not demanded of him, but, on the contrary, he was told by respondent that in his opinion if Vernon saw Mrs. Smith he could settle with her for very much less. He told Vernon that if he would take some flowers and a box of candy and go over and see her he could probably fix it all up. He did not at that time go to see her, and on October 17 the suit was commenced in the circuit court of Rock Island county and the declaration filed. At the original interview between respondent and Vernon it had been suggested that Mrs. Smith had a sister running a restaurant in Chicago and that Vernon and Mrs. Smith should meet there and get her assistance in settling the matter. Within a few days after the suit had been commenced Vernon met Mrs. Smith at her sister's restaurant in Chicago and had an interview with her lasting some hours, as the result of which, according to Vernon's testimony, he gave her sister $80 for Mrs. Smith, stating, "I figured that I owed her quite a little less than that but I wanted to surely cover it; I did not want to be under obligations." With reference to the suit Vernon testified, after the interview in Kelly's office: "I don't remember having any interview with either Flannigan, McCaskrin or Kelly about that suit or about Mrs. Smith. I never paid one cent to anybody to stop this proceeding or publication in relation thereto. I never had any intention of giving a cent to anybody."

On October 7, 1921, the *Davenport Democrat and Leader* published an article with reference to the alterca-

tion which had taken place between Vernon and Mrs. Smith on October 6. The information upon which this article was based was evidently obtained by the reporter for that paper who appeared upon the scene of the difficulty. The article published in the *Rock Island News* on October 15 mentioned no names and conveyed less information about the matter than was contained in the Davenport paper. The articles of October 22 and 29 were scurrilous, sensational and defamatory. Among other things, one of the articles set forth in full the declaration which had been filed in the suit and which contained statements which showed that at the time of making the assault of August 31 the parties probably were unlawfully intimate.

At the time these articles appeared in the *Rock Island News*, Looney, the publisher of the paper, was out of the city and the paper was in charge of Cy Hazlett. Hazlett testified that Myron Jordan and respondent were writers for the paper and that Looney instructed him to publish any articles from either of them; that he obtained material possibly once a week from respondent's office for printing in the *News;* that he also saw Jordan in respondent's office during the period these articles were published; that he saw Flannigan and respondent in respondent's office before the publication about Vernon in the *News,* and that the trouble between Mrs. Smith and Vernon was discussed by Flannigan and respondent in his presence; that Flannigan called him and asked him to go to Kelly's office, which he did; that Flannigan told him that respondent had a story of Vernon and a woman who used to work in a department store and asked him if he would publish it; that this was before the first publication in the *Rock Island News;* that Kelly also heard this conversation; that he met Flannigan at respondent's office within a day or two and got the first manuscript on the Vernon case; that Flannigan, respondent and Jordan were there; that he got a photograph of Vernon at respondent's office the following week from

Flannigan; that he got the manuscript of the article of October 22 at respondent's office; that Jordan, Flannigan and respondent's secretary were present at the time.

Hazlett is the only witness who attempts to directly connect respondent with the publication of the articles in the *Rock Island News.* This witness is the same Cy Hazlett who this court said in *People* v. *Looney,* 314 Ill. 150, was "a depraved person without character, reputation or shame." He is directly contradicted by respondent. Respondent testified that he did not have any connection or anything whatsoever to do with the preparation, writing or publication of the articles in the *Rock Island News;* that Hazlett did not at any time obtain any copy or manuscript for the articles from his office. Hazlett is contradicted with reference to his statements attempting to connect respondent with the publication of these articles, by respondent, Flannigan, Kelly and Jordan. Jordan testified as to each of these articles that it was either written by Hazlett, or by Hazlett and himself in collaboration, or by Jordan himself, and that respondent had no connection therewith. Respondent having denied all connection with the *Rock Island News,* an attempt was made to connect him with that office by Lawrence Pedigo, who said that while employed as a messenger for the *Rock Island News* he obtained about ten articles written for it from respondent's office, from respondent and Jordan. This testimony is denied by respondent and Jordan. Pedigo, at the time of testifying, was under indictment for pandering, for keeping a disorderly house, for carrying concealed weapons, for conspiracy to murder, and, along with Emeal Davis, Helen VanDale and John Looney, for the murder of William Gabel. He admitted that he had twice been guilty of perjury.

Relator called as a witness Emeal Davis, who testified that respondent and Jordan went to the office of the *Rock Island News* after Looney had gone away and searched

the place for manuscript written by Jordan and respondent. Davis testified that it was in the evening, while Pedigo testified that the same occurrence was in the daytime. Jordan and respondent both testified that they never went to the *Rock Island News* together and searched for manuscript written by them. Davis is a negro dive-keeper who had been arrested many times and is now under indictment with Cy Hazlett and Looney for conspiracy to cause a witness to abscond, and is also under indictment for the murder of William Gabel.

Henry Wehling testified that he had got some manuscript for the *News* at respondent's office. This is denied by respondent. Wehling admitted having been convicted as a bootlegger, that he had committed perjury in former trials, and that he had formerly been a bar-tender in Pedigo's house of prostitution.

Louis Andich testified that in the summer of 1921 he delivered to respondent a letter addressed to the "Rock Island News Agency, John Looney, Editor," at the direction of Dan Drost, who was busy folding papers and so unable to take it to respondent. The falsity of this testimony is shown by a stipulation by the counsel for relator and counsel for respondent that the jail records of Scott county, Iowa, showed that Drost was received in that jail on March 19, 1921, and was in custody from that date continuously until released, December 7, 1921.

Vernon testified that he was not acquainted with Looney; that he had never seen him but once; that he never had a conversation with him; that he did not at any time pay one cent to Looney; that he never paid one cent to anybody to stop the suit or any publication in relation thereto.

There is no evidence in the record showing or tending to show respondent did not believe that Mrs. Smith had a meritorious cause of action against Vernon for personal injuries, and the evidence falls far short of sustaining the

charges made in either the first, second or third count of the information.

The eighth count of the information alleges that respondent was guilty of combining and conspiring with John K. Scott, Thomas Cox and others to do illegal acts against the administration of public justice, in that he appeared in the circuit court of Rock Island county in the month of February, 1923, and obtained a continuance for Scott in the case of People *vs.* Looney, Scott and others, charged with conspiracy, the ground for the continuance being the engagement of respondent in the legislature of the State of Illinois as a member of the House of Representatives. It is claimed by relator that the action in obtaining the continuance was not for the purpose of aiding and assisting Scott in defending against the indictment and availing himself of the services of respondent in a trial of the case, but that the action in making the affidavit and motion for continuance was with the intention on the part of respondent to deceive the court and defeat justice in Rock Island county and for the special purpose of aiding and assisting Cox, Shriver and Pedigo, other defendants in said action, in obtaining delay in their own trial and a postponement thereof until after the adjournment of the session of the legislature. The principal witness in behalf of relator is Scott, who testified that he employed respondent in November or December as his attorney in indictments pending against him at that time and paid him a $100 retainer fee; that the suggestion for the continuance was at a conference of all the defendants and their attorneys in the library of the court house just before the case was called for trial and came from attorneys for other parties and not from respondent; that the motion and affidavit were prepared in Dietz's office and brought to the court house by him, and respondent was reluctant to sign the affidavit; that there had been proceedings in court during January and February with reference to preliminary mo-

tions to quash, etc., and Scott had been represented in those
matters by attorneys Ingleson and Allen; that it was con-
sidered good strategy on the part of the whole defense to
ask for a continuance as to him; that he did not expect
respondent to ask for a continuance and that he did not
expect one. Scott's testimony was entirely neutralized by
the affidavit which he made for a continuance, in which he
states that respondent is his attorney in the cause and was
actually employed as such prior to the commencement of
the session of the General Assembly; that the attendance
of respondent upon the trial of the cause is necessary to a
fair and proper trial of the cause on the part of the de-
fendant. Respondent's reluctance to sign the affidavit for
a continuance for Scott is explained by the fact that when
the motion for continuance was first presented to him it
asked for a continuance as to all of the defendants. As
respondent represented Scott alone he refused to file the
motion until it was amended by striking out the names of
the other defendants. He testifies that he first knew of the
motion for a continuance when Scott called him up and
asked him to help get a continuance. That he did not at-
tempt to deceive the court with reference to the matter is
evidenced by the fact that when the motion for a continu-
ance came on for a hearing he informed the court that he
was not the only attorney for Scott in the case but that
he wanted to be there to help try the case. W. C. Allen,
one of the attorneys in the case, testified that Scott desired
a continuance of the case, and that Scott said he did not
want the case tried without respondent being present. The
undisputed evidence shows that respondent performed other
services as attorney for Scott in and about the defense of
the indictments then pending, and, among other things, the
undisputed evidence shows that he consulted with the at-
torney who was representing the Attorney General in the
prosecution of these cases with reference to a disposition
of Scott's case without a trial; that that attorney informed

him upon what terms Scott might plead guilty, and that subsequently Scott did plead guilty. Respondent, in filing his motion for a continuance, supported by Scott's affidavit, was doing no more than follow out the course of procedure provided by the statutes of this State in case the attendance of an attorney who is a member of either house of the General Assembly and in actual attendance on the sessions of the same is necessary to a fair and proper trial of his client's suit.

The charge in the ninth count is that respondent advised and encouraged Cy Hazlett to secrete himself outside of the State of Illinois so that he would not be available as a witness and could not be called as a witness against John Looney for conspiracy. State's attorney Bell testified that he met Hazlett in Chicago prior to the trial of Looney and arranged with him to go to Rock Island to testify for the prosecution in the Looney conspiracy case, but that soon thereafter Hazlett disappeared and the prosecution had to go through the trial of the case without having Hazlett as a witness. Hazlett testified that he was in Rock Island in March, 1925, and that while he was seated in a car in front of respondent's office respondent came along and witness told him that he was going West and asked him what they could do if he went, and that respondent told him they could go to hell as far as he was concerned; that thereafter witness went to New Mexico to Looney's ranch, where he stayed until Looney was brought back to Rock Island when his case was set for trial; that he came back with Looney at that time and stayed in and around Davenport until after the trial was over. This conversation is denied in its entirety by respondent, who testified that during March, 1925, he had no conversation of any nature whatsoever with Hazlett. Reputable citizens of Rock Island testified that Hazlett's reputation for truth and veracity was very bad. Relator must be held to have failed to sufficiently prove the ninth count of the information.

The eleventh count of the information charges that during the fall of 1922 Helen VanDale was under arrest on a criminal charge brought by the United States government for transporting a female for the purpose of prostitution to, from and between the States of Iowa and Illinois; that respondent undertook to act as the attorney for her, and while acting as such attorney procured her to make a conveyance to him of her equity in certain real estate situated in Rock Island of the value of $3800; that respondent made an agreement with her to defend her in the matter of the criminal charge for $2500, and the conveyance of this property was procured by him as security for the payment of the $2500; that thereafter the charges against her were voluntarily withdrawn and dismissed by the United States government, and that respondent did not render services to her in the matter which were reasonably worth $2500; that after the dismissal of the charges she made a demand upon him for an accounting and a return to her of the property, or the value thereof in excess of the amount to which he was entitled as his attorney's fees in the matter; that he refused to re-convey the property to her and refused to account to her or to return any part of the value of the property until various strenuous efforts were put forth by her to cause him to make restitution to her; that he finally, on the 23d of February, 1923, paid her the sum of $700 and has since that time retained the title to the property. The evidence shows Helen VanDale became involved in several criminal charges and that she employed two attorneys by the names of Allen and Hanley to defend her, and that she agreed to pay them a fee of $2500; that she transferred the property to respondent. In response to the question, "What was the contract or understanding between you at that time?" she testified, "Well, I wasn't able financially to pay Mr. Allen and Mr. Hanley the attorney's fees and Mr. McCaskrin took the property and was to pay them for me." To the question, "And that

fee was to be how much?" she answered, "$2500." She testified that the property was never given back to her but that respondent gave her $800 after she got out of jail. Respondent introduced in evidence the following exhibit:

"12-26-22.

"To Harry M. McCaskrin—Pay to W. C. Allen and J. A. Hanley the sum of $2500 and hold the balance due me, to-wit, $1350, subject to my order. Said sum of $2500 to be in full of att'y fees.

MRS. HELEN VANDALE."

Respondent paid the $2500 to Allen and Hanley. Relator's information charges, and the evidence shows, that on February 23, 1923, while Helen VanDale was in the Scott county, Iowa, jail, $700 was paid to her by respondent. She was in jail there from December 5, 1922, until the 9th day of March, 1923. Respondent testified that he paid her in full after her release from jail, and in this he is corroborated by John P. Sexton, who testified that he was present in respondent's office some time in March, 1923, when Helen VanDale was there and respondent was settling with her for the property; that respondent was making a payment of $650, and that she had some coal in the cellar for which she wanted $100; that they finally settled on $50 for the coal, and that he then paid her $700, taking a receipt from her in full. She testified that "I signed papers that I was satisfied with the transaction." About September 20, 1924, she signed a petition in bankruptcy. When asked whether she told Lambach, the attorney who acted for her in the bankruptcy proceedings, that respondent owed her any money, she said: "I didn't tell Lambach McCaskrin owed me any money, because he didn't. I had already received the money, the $800, and had spent it."

The punishment to be inflicted by disbarment of an attorney is the destruction of his professional life. Only clear and satisfactory proof can justify a decision from which would flow consequences of such a grave nature. (*People* v. *Matthews,* 217 Ill. 94; *People* v. *Harvey,* 41

id. 277; *People* v. *Barker,* 56 id. 299.)   To justify disbarment the case made must be free from doubt, not only as to the act charged but as to the motive with which it was done. (*People* v. *Ader,* 263 Ill. 319.)   The evidence of his guilt with reference to the transactions charged in the information must be clear, and it is not sufficient that, taken as a whole, the evidence shows a state of facts not entirely creditable to the respondent and the other parties to the transaction but fails to show that the respondent has been guilty of dishonorable or criminal conduct. (*People* v. *Thornton,* 228 Ill. 42.)   In this case it is to be noted that practically every witness who gave testimony tending to show dishonorable or unprofessional conduct on the part of respondent was at the time under indictment and subject to be tried at the will of the special representative of the Attorney General, whose communication with the executive committee of the citizen's committee of Rock Island during the Looney murder trial caused that committee to ask the grievance committee of the Rock Island Bar Association to take up the matter of the disbarment of respondent. The testimony of these witnesses is open to the suspicion that they were attempting to curry favor with one who might be, to a certain extent, the arbiter of their fate. In a proceeding of this kind respondent can only be tried on the specific charges against him contained in the information. *People* v. *Allison,* 68 Ill. 151.

We are of the opinion that the evidence is insufficient, under the rules in disbarment cases, to establish the guilt of respondent of any of the charges in the information, and the rule to show cause why he should not be disbarred is discharged.

*Rule discharged.*

Mr. JUSTICE THOMPSON took no part in the decision of the case.