THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN P. LOONEY, Plaintiff in Error.

*Opinion filed February 16, 1927.*

1. CRIMINAL LAW—*conspiracy to commit crime charged may be proved.* Evidence is admissible to prove a conspiracy to commit the crime with which a defendant is charged although no conspiracy is charged in the indictment, and the acts and conduct of others acting in concert with the defendant in the commission of the offense charged are competent, although the indictment does not charge that the defendant committed the crime jointly with such other persons.

2. SAME—*what may be shown to prove a conspiracy.* The existence of a conspiracy may be proved not only by direct evidence but as well by inference from conduct, statements, documents and facts and circumstances which disclose a common design on the part of the accused and others to act together in pursuance of a common criminal purpose.

3. SAME—*when the existence of a conspiracy may be inferred.* Where it is shown by the evidence that different persons have by their acts pursued the same object, often with the same means, one performing one part and another another part with a view to the attainment of the same purpose, an inference may fairly be drawn that they were engaged in a conspiracy to accomplish that purpose, and it is not necessary that the conspirators should have met together or that all should be acquainted with one another, as one may be a party to a conspiracy who concurs in it after it is formed, without any preliminary agreement to do so.

4. SAME—*act of one conspirator may be proved as the act of each.* Where a conspiracy is established, every act or declaration of any of the conspirators in furtherance of the common purpose is regarded as the act or declaration of each of them and may be proved against all.

5. SAME—*when conspiracy may be proved to show motive in murder trial.* In a prosecution for murder the People may show, on the question of motive, that the accused was a leading figure in a conspiracy with city officials to protect violators of the law, for which protection money was paid the accused as blackmail, and that the deceased, who was one of those who had paid for such protection, turned informer to agents of the Federal government, thus establishing a motive for the accused and his accomplices to get rid of the deceased, and every transaction between the accused

and his accomplices in the protection of vice is admissible in evidence to show the existence of the conspiracy.

6. SAME—*it is always proper to prove a motive for the crime charged.* Where a deliberate criminal act is proved the People are not required to prove a motive for it, but the presence of a motive for the accused to commit the act charged is important in considering the question whether he did commit it, and it is always proper for the People to prove motive where it can be done.

7. SAME—*general rule as to when evidence is admissible although it shows another offense.* The objection that evidence offered tends to prove the defendant guilty of a different crime from that with which he is charged is not valid if the evidence offered tends to prove him guilty of the crime charged, and evidence which tends to prove any fact material to the issue on trial is competent even though it proves the defendant guilty of another crime.

8. SAME—*conviction may be had on uncorroborated testimony of accomplices.* While the testimony of accomplices must, as a matter of law, be received with suspicion and acted on with great caution it is nevertheless competent evidence, and a conviction may be sustained on such testimony, uncorroborated, if it is of such a character as to convince the jury, beyond a reasonable doubt, of the guilt of the accused.

9. SAME—*when, only, may the jury reject testimony.* The jury have no right to reject without consideration any evidence which has been admitted as competent, but if, upon consideration of the testimony of any witness in connection with all the evidence in the case, they deem it unworthy of belief they have the right to reject it.

10. SAME—*when testimony of accomplices may be considered as corroborated.* For testimony to be regarded as corroborated it is not essential that it be corroborated in every particular, and if the testimony of accomplices is corroborated in material parts by respectable witnesses the jury may take that fact into consideration in weighing such testimony and in determining to what extent the fact that an accomplice has testified truly in regard to some material matter justifies giving credit to other parts or to all of his testimony.

11. SAME—*when an instruction as to liability of accomplices is proper.* In a murder trial, where there is no direct evidence as to who committed the homicide but the People have proved motive by evidence that the accused was a leading figure in a conspiracy with city officials to protect and control vice and that it became necessary to the success of the conspiracy to remove the deceased, who had become an informer, it is proper to give an instruction stating the fundamental doctrine of the responsibility of accom-

plices in crime for the acts of each in furtherance of the common design, and that accomplices are liable for homicide committed in pursuance of a common design even though the one who actually commits the homicide cannot be identified.

12. SAME—*when instructions may be refused as being repetitions of a given instruction.* Where several accomplices have testified implicating the defendant and the court has given an instruction stating the general proposition that if the jury believe from the evidence that "any person" was induced to testify by any promise of immunity they may take such fact into consideration in determining the witness' credibility, it is not error to refuse instructions stating the same proposition but inserting the name of each witness, respectively, in place of the words "any person."

WRIT OF ERROR to the Circuit Court of Knox county; the Hon. WILLIS F. GRAHAM, Judge, presiding.

O. O. ASKREN, R. D. ROBINSON, I. R. WASSON, and JOHN DOUGHERTY, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, BEN S. BELL, State's Attorney, CHARLES W. HADLEY, ROBERT C. RICE, S. M. MEADOWS, and EDWARD L. EAGLE, (JAMES J. BARBOUR, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

John P. Looney prosecutes this writ of error to review the judgment of the circuit court of Knox county by which he was convicted of murder and sentenced to imprisonment in the penitentiary for fourteen years.

The indictment was returned at the May term, 1925, of the circuit court of Rock Island county and charged the plaintiff in error jointly with Lawrence Pedigo, Joe Richards, Leonard Walker, Emeal Davis, Heine Lee, Helen VanDale, Louis Ortell and Henry Auerochs with the murder of William Gabel. On the petition of the plaintiff in error the venue was changed to Knox county, and at the November term, 1925, of the circuit court of that county the plaintiff in error alone was put on his trial, which resulted in his conviction.

The plaintiff in error contends that the judgment should be reversed for errors in the admission of evidence, errors in giving and in refusing instructions, and because the evidence does not sustain the verdict.

Gabel kept a saloon in certain premises on the north side of Fourth avenue, in the city of Rock Island, near Twenty-fourth street, and conducted a house of prostitution in the same premises. Just before midnight on July 31 his automobile was parked on the north side of Fourth avenue, immediately in front of his saloon. At 11:30 that evening he had stopped at the saloon of Henry Auerochs, at the corner of Sixteenth street and Fourth avenue, eight blocks west of Gabel's saloon, and had remained there about twenty minutes, when he left, saying he was going home. From the circumstances under which he was killed immediately after arriving in front of the saloon it appears that he must have got out of the car on the side away from the curb, and as he went around back of it to go into the saloon a number of shots were fired and he received three gunshot wounds through the body, one of which passed through his heart. He fell with his shoulders on the curb and died immediately. The evidence does not show who the persons were who fired these shots or how many of them there were. No eye-witness testified to the murder and the evidence relied upon to connect the plaintiff in error with it is circumstantial. Just before these shots Mrs. Elizabeth Thorpe, who lived at No. 2309 Fourth avenue, in the middle of the block between Twenty-third and Twenty-fourth streets, west of Gabel's saloon, with two dwellings intervening, who had been sitting up, reading, walked to the front of the house and looked out of the window. She saw a big new car with bright lights pass her house going east a little past the middle of the block, then turn around and stop on the north side of the street, just in front of her house. Two men got out of the back seat and went toward Gabel's. Mrs. Thorpe walked to the front door and

was going to open it when she heard shots—four or five or six, perhaps more, she could not tell just how many. She did not open the door but walked back to the window and saw the two men come back and get in the car, which drove off west. She then opened the door and went out on the porch and saw a man whom she did not know standing on the sidewalk down by Gabel's. There were four other men in the car besides the two who got out.

West of Mrs. Thorpe's house, at the corner of Twenty-third street, John Koletis lived up-stairs. He was in the moving picture business and got home the night of July 31 a few minutes before twelve o'clock. He testified that he went in the front door and saw a car with bright lights standing at the north curb, east of his house. He went to the kitchen, where a magazine attracted his attention and he sat down to read. Within from two to five minutes of the time he saw the lights of the car he heard four shots. Then he heard the shifting of the gears of the car and ran to the front room and looked out the window. He saw a large new touring car going west. It had passed Twenty-third street fifteen or twenty feet and was going twenty-five or thirty miles an hour. The car was parked twenty-five or thirty feet from where he lived, toward Gabel's place, and was the only car he saw there. He saw two men on the front seat and one on the back but did not recognize anybody.

W. B. Moneymaker was the night watchman for the Rock Island Garment Company, at Twenty-fourth street and Fourth avenue, on the south side of the avenue. On the night of July 31 he had pulled the Western Union box at twelve o'clock and was sitting down, eating his supper, when he heard some shots,—four, five or six. He was inside the building, down-stairs. He ran up-stairs to an open window and looked down on Fourth avenue and Twenty-fourth street. He saw two cars, their lights dim, going west on Fourth avenue, somewhere about Twenty-

third street and maybe farther. They went out of sight immediately. There was a car standing still, headed west, which must have been right in front of the Gabel property. There was a car on the south side of Fourth avenue headed east, just a little west of the corner of Twenty-fourth street. In a few minutes this car came east to Twenty-fourth street, turned south on Twenty-fourth street to Fifth avenue, and then east on Fifth avenue. He could not tell what kind of a car it was. He could just tell it was a big car and was not in any hurry.

Frank Strandburg was the night watchman for the J. Peterson Company, at Twenty-fifth street and Fourth avenue. It is a long block from Twenty-fourth street east to Twenty-fifth street. He testified that he was about one hundred feet from the corner, on the south side of Fourth avenue, making his round punching clocks at twelve o'clock. After he got through he went out and sat outside the door on Fourth avenue on a little porch about five steps high. Just as he came out and sat down he looked down the street and heard the report and saw the flash of a gun, which came from an automobile about fifteen feet from the north curb on Fourth avenue, in front of the Gabel property. The shots came so fast he thought there must have been about six shots fired. He heard the reports but did not see the flashes or shots from any other place. Gabel's car was standing there. There was a car on the south side, right across the street from Gabel's, headed east. Two men came across the street from Gabel's, got into it and drove around the corner south on Twenty-fourth street. It was a large car. The only other car he saw was the one that the shooting was done from and that went west on Fourth avenue. The car from which the shots were fired was standing when he saw it and after the shooting it drove west. A little after that he saw the two men walk across from the Gabel place and get into the other car across the street. They did not walk fast.

An examination of the body of Gabel disclosed that all the bullets which passed through the body entered the right side. Besides bullet wounds through the body there was a bullet wound through the right leg, a grazing wound on the right side of the chest, an abrasion of the right shoulder blade as though a bullet had grazed the shoulder, which penetrated directly between the neck and the shoulder joint, and another wound over the left collar bone, which seemed to have been grazed by a bullet,—a straight black line.

The theory on which the People relied to convict the plaintiff in error was that he and his co-defendants, all of whom were keepers of saloons or houses of prostitution or gaming houses, or were engaged in two or more of such occupations violating the statutes of the State and the ordinances of the city, had conspired together, and with others, officers of the city of Rock Island and persons engaged in the criminal enterprises of the character mentioned, to carry on and control gambling, prostitution and the transportation and sale of intoxicating liquors in the city of Rock Island; that Gabel was one of the conspirators and had given to the agents of the Federal government certain information and documents tending to prove such conspiracy for the purpose of exposing the conspiracy and aiding in prosecuting the conspirators, including the plaintiff in error; that for these reasons it became necessary to remove Gabel, and the plaintiff in error and his co-defendants, together with other persons, in carrying out the purposes of the conspiracy murdered Gabel. The indictment in this case did not charge a conspiracy but was an ordinary indictment against several defendants for murder. The evidence of the murder, however, disclosed a conspiracy, and it is contended by the People that the conspiracy to accomplish this murder was a development of the conspiracy charged in *People* v. *Looney,* 314 Ill. 150, in which the plaintiff in error was indicted jointly with Harry M. Schriver, the mayor of the city of Rock Island, John K.

Scott, the city attorney, Thomas Cox, the chief of police, Lawrence Pedigo, who is one of the defendants to the present indictment, and Robert Kinner, for conspiracy to furnish punch-boards and other gaming devices to keepers of saloons, gaming houses and houses of prostitution and to protect them from arrest and keep them free from police molestation while they were engaged in the city of Rock Island in keeping, maintaining and operating such gaming devices, saloons, gaming houses and houses of prostitution, and to use the powers of the offices of mayor, chief of police and city attorney to coerce and require the keepers of such places to purchase, lease, use, keep, maintain and operate gambling devices and share the profits and proceeds therefrom with the defendants, and to refrain from arresting such keepers and to protect them and keep them free from molestation and attack while engaged in such business. There was a separate trial of three of the defendants, Schriver, Cox and Pedigo, who were convicted, and the judgment was reversed on account of the admission of incompetent evidence and the giving of one instruction for which there was no basis in the evidence. In the present case all the defendants who were indicted jointly with the plaintiff in error testified except Leonard Walker, and all denied any connection with the killing of Gabel. Their testimony, as well as that of numerous other witnesses on behalf of the prosecution, was of the general character of that set forth on pages 161 and 162 of the opinion in *People* v. *Looney, supra,* and tended to prove the existence of the conspiracy alleged in the indictment in that case, of which the plaintiff in error was the leading spirit, his coercion of persons engaged in criminal activities of the kind mentioned by means of his scandalous and blackmailing paper, the *Rock Island News,* his connection with the city officers and control through them of the police, and his ability, through such connection and control, to protect persons guilty of such criminal activities from prosecution

and punishment for their crimes. The testimony detailed
a great number of instances of violations of the law, as to
many of which there is no evidence of the direct participa-
tion of the plaintiff in error therein, and in each of these
instances objection was made that the evidence showed an-
other offense different from the one for which the plain-
tiff in error was on trial and one which had no connection
with the murder and no tendency to prove the plaintiff in
error guilty of murder. The place and time of the mur-
der, the number of shots fired and the celerity with which
the scene of action was cleared of the presence of any
person responsible for the crime, clearly indicate that more
than one person was engaged in the enterprise and in the
actual shooting, and make it certain that the murder of
Gabel was the result of an arranged scheme of concerted
action, or conspiracy. Proof of a conspiracy was not nec-
essary to the conviction of the plaintiff in error if it had
been clearly shown by direct and positive evidence that he
actually participated in the murder by firing a shot or that
he was actually present encouraging or assisting in the
murder, but in the absence of such evidence it was neces-
sary to show that he combined with one or more of the
defendants to murder Gabel. If such a condition existed
and Gabel's death followed as a result of the concerted
action of those combining and carrying out their plan it
would be murder, and all those joining in the plan would
be guilty, whether present at its consummation or not. The
combination would be effected by the assent of minds to
the common purpose, and such a combination may be es-
tablished by inference from facts proved as well as by di-
rect evidence of the express agreement of the parties. It
being the theory of the prosecution that the plan for the
murder of Gabel was an outgrowth of the conspiracy for
the protection of the criminals mentioned from prosecution
and the collection of blackmail from them as the basis of
such protection, it became necessary to prove such conspir-

acy. The law is well settled that evidence is admissible to prove a conspiracy to commit the crime with which a defendant is charged although the conspiracy is not charged in the indictment, and that the acts and conduct of others acting in concert with the defendant in the commission of the offense charged are competent, though the indictment does not charge a conspiracy or that the defendant committed the crime jointly with such other persons. *Spies* v. *People,* 122 Ill. 1; *State* v. *Buck,* 194 Mo. 416; *People* v. *McKane,* 143 N. Y. 455; *Gill* v. *State,* 59 Ark. 430; *Rex* v. *Stone,* 6 T. R. 527; Wharton on Crim. Evidence, sec. 700.

A conspiracy need not be proved by direct evidence of an express agreement to do the unlawful thing to be accomplished. It is generally proved by a number of acts, documents, statements, facts and circumstances, each of which, merely of its own force separately considered, may seem unconnected with any concerted scheme and may have no tendency to prove the common purpose, and yet, when all are considered together in their relation to one another, to the parties, to their effect, to their apparent object and the final result accomplished, they may be sufficient to convince the mind to a moral certainty that the persons accused have adopted a criminal course of action to accomplish that result. The existence of the crime may be proved not only by direct evidence but as well by inference from conduct which discloses a common design on the part of the accused to act together in pursuance of the common criminal purpose. (*Spies* v. *People, supra; Franklin Union No. 4* v. *People,* 220 Ill. 355; *People* v. *Flack,* 125 N. Y. 324; *Kelley* v. *People,* 55 id. 565.) Where it is shown by the evidence that different persons have by their acts pursued the same object, often with the same means, one performing one part and another another part, with a view to the attainment of the same purpose, an inference may fairly be drawn that they were engaged in a conspiracy to accom-

plish that purpose. (*Spies* v. *People, supra; People* v. *Lloyd,* 304 Ill. 23; *People* v. *Small,* 319 id. 437; *People* v. *Ochs,* 124 id. 399; *People* v. *Lawrence,* 143 Cal. 148; *State* v. *Ryan,* 47 Ore. 338; *Garland* v. *State,* 112 Md. 83; *Kelley* v. *People, supra.*) It is not necessary that the conspirators should have met together or that all should be acquainted with one another. If one concurs in a conspiracy after it is formed no agreement for such concurrence is necessary to establish his guilt. *Spies* v. *People, supra.*

There was direct proof of the conspiracy to protect criminals from prosecution or molestation in consideration of tribute paid to Looney in cash, in the purchase of intoxicating liquor at extortionate prices, in the supposed purchase of land in New Mexico without regard to value, in the purchase of stock in the *Rock Island News,* and there was evidence of submission to Looney's protection from the police by some criminals, produced by the threat of publication in the *Rock Island News* of their delinquencies. We say nothing, for the present, of the character of the source of this evidence. There was an abundance of evidence that Looney, through his agents, was actively engaged in transporting and selling intoxicating liquor and in collecting money from keepers of saloons, gaming houses and houses of prostitution for the privilege of operating such places without molestation from the police, and that in association with city officers he was furnishing to such criminals, to some extent, the protection which he promised. This constituted Looney, the city officers who co-operated with him and all the saloon-keepers, gaminghouse-keepers and keepers of houses of prostitution conspirators to impede and prevent the enforcement of law and the city ordinances in the city of Rock Island. When a conspiracy is established, every act or declaration of any of the conspirators in furtherance of the common purpose is regarded as the act or declaration of each of them and may be proved against all. (*Spies* v. *People, supra; Franklin Union No. 4*

324—25

v. *People, supra; People* v. *Rudecki,* 309 Ill. 125; *Knox*
v. *State,* 164 Ind. 226.) Every transaction, therefore, be-
tween Looney or his agent and any law-breaker of the
classes heretofore mentioned, in pursuance of the plan for
the protection of the law-breaker from the law, was ad-
missible in evidence to show the existence of the conspir-
acy, and if one act did not prove a conspiracy, so much
greater was the reason why the People should be permitted
to prove more acts until they were sufficient to prove the
conspiracy. The object of proving the conspiracy to pro-
tect violators of the law from prosecution was not to hold
the plaintiff in error responsible for that conspiracy or any
act in connection with it, but was preliminary to the intro-
duction of evidence that Gabel, who was a conspirator, had
delivered to Federal agents evidence of the conspiracy, and
acts done under it, which were criminal offenses against
the Federal government, and had thereby exposed Looney
and all his fellow-conspirators to the danger of prosecution
by the Federal government. The prosecution sought thus
to establish a motive for the plaintiff in error and his ac-
complices in the conspiracy to get rid of Gabel and be will-
ing to commit murder to do so. Such proof of motive
had to begin with proof of the conspiracy. This was the
reason the court overruled the contention of counsel for
the plaintiff in error that a conspiracy to control vice could
not be presented in this case but the prosecution should be
confined to conspiracy to murder Gabel, even though, inci-
dentally, it might show that the motive grew out of some
collateral fact, and the decision was right. Where a delib-
erate criminal act is proved the People are not required to
prove a motive for it, but the presence of a motive for the
accused to commit the act charged is important in consid-
ering the question whether he did commit it, and it is al-
ways proper for the People to prove motive where it can
be done. (*People* v. *Watkins,* 309 Ill. 318.) The objection
that evidence offered tends to prove the defendant guilty

of a different crime from that with which he is charged is not valid if the evidence offered tends to prove him guilty of the crime charged. Evidence which tends to prove any fact material to the issue on trial is competent even though it proves the defendant guilty of another crime. *People v. Watkins, supra; People v. Spaulding,* 309 Ill. 292; *People v. Swift,* 319 id. 359; *People v. Campbell,* 323 id. 129.

In June, 1922, a convention, called the Grotto convention, was to be held in Rock Island, beginning June 26 and lasting four days. Evidence was introduced to show that notices were given to those who had the privilege of practicing their unlawful occupations in disregard of the law under the protection of the plaintiff in error, that they would be required to pay for the privilege of doing so, during the convention, amounts fixed by the plaintiff in error in each case. The amount required of Gabel was $1000, which he said he could not afford to pay, but he finally compromised on $300 and gave Ortell a check for that amount, which Ortell indorsed and gave to Looney. During the convention R. C. Goss, an anti-narcotic agent of the United States, who had been temporarily assigned to the prohibition department, was in Rock Island, accompanied by several prohibition agents. On June 27 twenty-two or twenty-three warrants were obtained in Peoria for searching places in Rock Island, and in the evening of June 28, at about 9:30 o'clock, a request was made to Tom Cox, chief of police, for aid in executing the warrants. Cox said it was impossible to furnish men until 11:00 or 11:30 o'clock. At eleven o'clock three or four men were furnished and all the places visited. All were closed but two and no liquor was found. Some of the proprietors were warned of the search. Auerochs testified that Cox telephoned him about nine o'clock that government men were in town and he should close up, and it is a fair conclusion from the evidence that all received warning. Goss left on June 30 and returned on July 20 for the hearing before

the commissioner of some of the cases which he had begun. Looney appeared as attorney for the defendants. Only one case was heard and the rest were taken to Peoria. Goss remained in Rock Island working under instructions to continue the investigation relative to graft, prohibition and narcotics. Cy Hazlett, who had been an agent of Looney in running the *Rock Island News* and associated with him in the collection of blackmail from saloon-keepers, gamblers and prostitutes, became an informer and assisted Goss and his associates in the investigation. Among others, Goss called Gabel on the telephone, and Gabel came to see him on Tuesday, July 25. They had two meetings at Goss' office in the post-office, and finally on Friday night, July 28, Goss went to Gabel's saloon and had a conversation with him there in the back room. Gabel delivered to him ten checks signed by Gabel, stamped "paid" by the bank on which they were drawn, all payable to the order of Louis Ortell and bearing the indorsement, "Lou Ortell." Two bore the indorsement "John Looney" also. They were of various dates, from March 23, 1921, to July, 1922. Six of them were for $75 each, and the other four for $115, $150, $200 and $300, respectively. James R. Darnell, and Dennis J. Bennett, a detective of the Rock Island police department, were present, and Darnell put his initials on the checks to identify them. Some of the checks were handed to Goss and some to Bennett, but later all were given to Goss. Gabel was to give Goss more checks later but did not do so. He told Goss what the checks were for, and the next afternoon, Saturday, at the post-office, he made and signed a written statement. That statement was offered in evidence but on objection by the plaintiff in error the offer was withdrawn. Goss saw Looney drive past Gabel's place with his son twice Friday night just before dark, and saw the son drive by the saloon in the car that night after the delivery of the checks but could not see who was with him.

Pedigo testified that on Saturday night Looney told him that Gabel had given some checks to Goss which Ortell had taken from Gabel and it was necessary to get the checks back; that Auerochs was to take Goss and Bennett across the river to Davenport and there have them arrested and the checks taken away from them. Looney called Pedigo to his house Monday night (the night of the murder) about seven or eight o'clock and told him that he had it framed with the chief of police in Davenport to take Goss up on the charge of disorderly conduct and get him in jail and get those checks; that Auerochs would have Goss drunk so there wouldn't be any trouble, and Looney wanted Pedigo to watch them, and when they were in Davenport tell Looney where they were and they would be taken to the police station.

On Saturday afternoon, July 29, Goss took Gabel's written statement, and the same day he filed a complaint against John Connor Looney and Pedigo before commissioner Busch, in Davenport. Late that night, about eleven o'clock, Goss and Gabel went together to Auerochs' saloon to see if they could get some canceled checks which they supposed Auerochs had. They remained there until three o'clock Sunday morning and left just as day was breaking. Gus Krueger was a policeman whose beat extended from Twentieth to Twenty-sixth street and from First to Sixth avenue, and included the Gabel saloon on Fourth avenue and the premises adjoining it on the east at the corner of Twenty-fourth street, which were occupied by Helen Van-Dale as a saloon and house of prostitution. He testified that on Friday night as he was patrolling his beat he met Goss and Darnell at Twenty-third street and Fourth avenue and went with them to Gabel's place. After they came out and were standing about ten o'clock in front of the saloon Krueger saw Looney and his son drive by in their Marmon roadster, going east. At Twenty-fourth street they turned around and went back again on Fourth ave-

nue. He saw Looney two or three times that evening just riding in the car with his son. The next night, Saturday, while Krueger was on duty, he again saw Looney and his son in the Marmon car. They drove over Twenty-third street to the alley between Third and Fourth avenues. They stopped there and Looney got out and went up the alley east toward Twenty-fourth street. Krueger then went east on Fourth avenue to Gabel's place, looked through the window and saw Looney come in the back of the saloon. Krueger opened the front door, and Looney, when he saw Krueger, went out through the back door. That night Looney and his son were following Krueger around in the Marmon roadster, and Krueger saw them in the car about a dozen times that evening and as late as three o'clock A. M. Krueger was not on his beat Monday night. He went on his vacation, which began that day. Ed Miner was to take his place. Miner was dead at the time of the trial. His brother, Charles H. Miner, who was also a police officer, testified that on Monday night, July 31, 1922, he was the patrol driver, whose duty it was to drive the station wagon. About 6:30 o'clock that evening Cox, the chief of police, asked him to go home, change to civilian clothes and go with Goss, a government man. Cox asked him whom they could get to leave in the station, and Miner told him that Miner's brother was the only night man who could drive the wagon, and in answer to Cox's inquiry said that his brother could be located at Twenty-sixth street and Fifth avenue, at the end of that beat. His brother was extra man working during vacations and this night he was taking Krueger's place. Nobody was on Krueger's beat that night. His brother took Miner's place at the station and Miner went to the Como Hotel at eight o'clock to report to Goss, but, not finding Goss there, returned to the station until 11:45, when he went to supper at Gavin's restaurant, adjoining the Sherman Hotel. When he came out of the restaurant he saw Pedigo standing between the restaurant

and the Sherman Hotel, who called his attention to Pedigo's new car. He left Pedigo and started to the station, a block away, and when he got in the middle of the block he saw his brother leaving the station in the wagon. He signaled his brother and got in the car. They went to Gabel's place, picking up officer Hastings on the way, and met officer Bealer there when they arrived. Gabel was lying on his back behind the car, his feet extending into the street. His Cole car was there, and Miner examined it and found a bullet hole on the left side, at the rear part of the fender. He saw the hole made by the bullet but not the bullet.

Edward Bealer was the first policeman to arrive on the scene of the murder. He was on Twenty-sixth street and Fifth avenue when he heard the shooting—he judged about eight shots. He ran north on Twenty-sixth street to Fourth avenue, and looking west saw a big roadster turn south on Twenty-fourth street and a large car go west on Fourth avenue at about Twenty-second street. Going west on Fourth avenue he asked a watchman who was on a platform at the Victor works where the shooting was. He went to Gabel's place. He saw no one on Fourth avenue but the watchman. Gabel was dead, lying about eight feet back of his car with his head and the upper part of his body lying over the curbstone. The body had not been moved. Bealer waited until Dr. DeSilva came. He found, after the body was moved, a bullet that had been fired and a leather key-case lying under the right shoulder and delivered them to Charles Miner, patrolman.

Orville Bragg is a son-in-law of Krueger. He was a police officer in 1922 and in July was motorcycle officer. On Saturday, July 29, he worked from two o'clock in the afternoon until two o'clock Sunday morning. He then took a ride in a Ford coupe around Twenty-third, Twenty-fourth and Twenty-fifth streets to see his father-in-law, whose beat included those streets. He saw Looney on Twenty-

third street and Third avenue with his son, sitting in a
parked Marmon car which he had seen frequently and
knew well. He saw them afterward that night at Twenty-
fourth street and Fourth avenue, driving south on Twenty-
fourth street.

Monday afternoon Goss and Unger were at the Como
Hotel in their rooms when Schriver, the mayor, and Cox,
the chief of police, came to the hotel and asked Goss if he
had anything against the Rock Island police department or
any of its members, and Goss replied that he had nothing
against the police force. Schriver and Cox then asked
Goss and Unger if they would appear that evening before
the police commissioners at the station and repeat what
Goss had stated to them. They went to the police station
that evening about eight o'clock, saw the chief of police, a
police officer, Jack Wall, whom the evidence shows to be
a bootlegger from Davenport, a man named Dietz, and one
or two police commissioners. They were at the police sta-
tion about forty minutes. Unger went back to the hotel
but Goss did not. Goss testified that shortly after Schriver
and Cox left the hotel, about five o'clock, he saw Looney
with his car parked across the street from the hotel. A
Hudson car kept circling the hotel. It would come down
in the street fairly fast until it came to the alley, then it
would pass the hotel on Eighteenth street about as fast as
a man could walk, then it would turn and come back on
the street in front of the hotel and go on south. It passed
the hotel five or six times. Unger testified to this action
of the Hudson car and testified that he noticed the same
cars passing the hotel,—the Hudson car and another make
of car and Looney's car, which was a Marmon roadster,—
possibly an hour or an hour and a quarter after he got
back from the police station. Gabel came to Unger's room
between 5:00 and 10:20 and stayed until 11:20 or 11:30
o'clock. During that time Cy Hazlett was in Goss' room,
the two rooms being connected. While Gabel was there

Unger noticed the movement of the cars. Gabel left the hotel between 11:20 and 11:30.

Pedigo testified that about 10:30 in the evening he was just leaving the Sherman House in his car when Looney came by with his son and Emeal Davis in a Lincoln car. He signaled Pedigo to follow, and Pedigo, who was in his own car, did so. They stopped, and he asked Looney why Auerochs did not take the fellows across the river. Looney answered, "Never mind; never mind; you go to the hotel and you be with somebody and stay there until you hear from me." Pedigo went to the hotel and stayed there with Joe Richards until nearly twelve o'clock. When Charles Miner, the policeman, came along, Pedigo showed Miner the car and walked to the corner, talking with him. A patrol wagon came along and Miner got in and went up Third avenue in it. He called Richards, and they went in Pedigo's car up Second avenue to Twentieth street and Third avenue, where they heard that Gabel had been killed. Then they drove to Davis' place, on Twenty-first street and Third avenue. They returned to the hotel and Pedigo called Connor Looney on the telephone and told him that Gabel had been killed. Connor told him to go down and see what he could hear. He went with Richards to Gabel's place, talked with officer Miner, came back to the hotel and called Connor Looney, telling him that Gabel was dead, and Connor said all right; he had better stay around the hotel now. The next forenoon he saw Looney at his home. Looney asked him what did he hear. He said everyone in town is accusing Pedigo of killing Gabel. Looney said, "That is what we want done," and asked where Pedigo was the night before. Pedigo told him he was talking with a policeman by the name of Miner and with Richards, and Looney said, "That is fine." Pedigo said, "Suppose they accuse you?" and Looney said, "Never mind, my boy; never mind."

Emeal Davis testified that that evening Connor Looney came to his place, at Third avenue and Twenty-first street, at eight o'clock, driving a Lincoln car. They went to look for his father and found him in the vicinity of Third avenue and Twentieth street. Looney got in the car and they went to the corner of Fourth avenue and Sixteenth street and stopped and waited for Pedigo. He came up, stopped his car at a little distance, got out and talked with Looney. Looney walked around a few minutes, came back, got in the car and said, "Go ahead." They then went east on Fourth avenue to Seventeenth street and then to Third avenue. They talked there awhile about the Miner car— the Lincoln which they were in. They then drove to Davis' place, on Third avenue and Twenty-first street, and he got out awhile. Looney and Connor went on. Connor came back about 10:30 with his father in the same car and Davis went with them. Connor was driving and Davis was sitting in the front seat beside him, Looney in the back seat. They drove east to Twenty-third street and along Twenty-third street and into the alley between Third and Fourth avenues, back of Gabel's and Helen VanDale's places. Connor said, "They are not here," and his father said, "Go ahead." They drove on through the alley into Twenty-fourth street and then south to Fourth avenue, where they stopped about fifteen minutes. Connor and Davis remained in the car. Looney got out and went south across Fourth avenue to another car, which was Louis Ortell's. While the Lincoln car was standing there another car was standing on the north side of Fourth avenue, about one hundred feet east of the corner of Twenty-fourth street. Looney talked a few minutes, then came back, got in the car and said, "That is all; go ahead." They went west on Fourth avenue, then to Third avenue and around again into the alley back of Gabel's and Helen VanDale's. The car that had been standing on Fourth avenue followed the Lincoln

car into the alley and stopped a short distance directly be-
hind it. Looney got out and went to the back of Helen
VanDale's place. Somebody came out who looked like
Butch Ginane, but Davis was not sure. While they were
sitting there Davis suggested to Connor that perhaps the
car behind wanted to pass, and Connor said, no; he did
not want to pass; if he did there was plenty of room, and
waved for him to come out, and the car passed out of the
alley. The car looked to be full of men, though Davis
could not identify any of the persons in it. It went out
of the alley around on Twenty-fourth street. In a few
minutes Looney called his son, who went over and talked
with his father. They were talking with Ginane. After
Connor went over they moved out of sight of Davis toward
Helen VanDale's place. They were gone five or six min-
utes. While Davis was sitting in the car they came back,
and finally Looney said, "You go ahead, Connor." Looney,
Connor and the stranger were about twenty feet from the
car. The stranger was out of sight. Davis did not see
him. Connor came around and started the car. The last
Davis saw of Looney he was standing by the car talking
to Connor. They went out of the alley the same way they
went in and drove to Davis' place, at Twenty-first street
and Third avenue. Connor drove to Twenty-second street.
It was close to twelve o'clock. Fifteen or twenty minutes
later Davis was out on the street when Pedigo came along,
and from him he learned that Gabel had been killed.

Helen VanDale testified that on that evening Cox came
to her place, and Jack Pender, who was chairman of the
police and fire board, came after the meeting of that board
was over. Ginane, who was a city detective, was also there,
and the four, Helen and the three men, went in a police
Ford to Al Gregg's, who sold beer on Thirty-first street.
They went into an alley there and drank some beer. Later
in the evening Jack Wall, Heine Lee, Pat Dietz and Goss
came up there. Dietz, she said, was a police officer in

Davenport, Wall a bootlegger, and Goss she guessed was a government man. Lee was her brother-in-law and bartender. The eight all met in the alley at Gregg's and stayed there until 11:00 or 11:30 o'clock. Then, she continued, the four in the Ford returned to her house. Lee took Dietz to work in Davenport, where he had to be on duty at 11:00 o'clock, and came back with Wall and Goss. Then he went over to Davenport, driving Wall's Packard, to get some beer for the party to drink. He came back with the beer, and while he was gone the rest of the party, including Helen's sister and two other girls she had in the house, were drinking and dancing. There was a telephone call, which she answered up-stairs. She was asked if Tom (Cox) was there, and asked who this was. The answer was, Louie (Ortell). She thought she knew the voice and believed it was Ortell. She went down-stairs and delivered the message to Cox, who told Ginane to go up-stairs and answer. She said it was about 11:30 or 11:45, though she had no watch or clock. Ginane answered the telephone up-stairs and she could not hear what was said. He came down-stairs and talked with Tom in the kitchen and then Ginane went out the back door. Helen was talking with Lee about midnight, when they heard some shots. She went in the house and Smith came in and asked what was wrong next door—the ambulance was there. Cox and Ginane, who were standing by the ice-box, talking, then went out the back door and in a few minutes came back to the front door and rang the bell and said that Gabel had been killed. Ginane and Cox were both dead at the time of the trial.

It appears from the evidence that Gabel had delivered the canceled checks to Goss, had signed and delivered a written statement, had tried to get similar checks from Auerochs, and was acting with and aiding Goss in his investigation of the conspiracy which existed in Rock Island for the protection of criminals in their violations of both Federal and State laws and of city ordinances; that Looney

knew what Gabel had done and had desired to prevent it but had been unsuccessful; that he hoped to recover the papers by having Goss arrested, but had discarded that plan and determined to get rid of Gabel himself and his efforts, and for that purpose planned to kill him. Through the assistance of the police, the policeman on the beat which included Gabel's place was taken away, Goss and Unger were invited to the meeting of the police commissioners at eight o'clock, from which the chief of police, police commissioner Pender, who was chairman of the board, Dietz, a visiting police officer from the neighboring city of Davenport, an obliging bootlegger from the same city, and a complaisant prohibition agent of the United States, went to a dancing and drinking party in a house of prostitution next door to Gabel's house of the same character. The driver of the patrol wagon was directed to report to Goss at eight o'clock in civilian dress. This made a substitute necessary at the police station, and for this purpose Miner, the patrolman on the beat including the Gabel place, was called into the station for the night. In the meantime Gabel was kept under observation. He went to Auerochs' saloon a few minutes after ten o'clock and was there about five or ten minutes. He wanted Auerochs to go with him to Goss' office, but Auerochs did not go. He then went to the Como Hotel, only two blocks away, where he remained in the rooms of Goss and Unger with Unger and Hazlett about an hour and a quarter. After Gabel had gone Ortell came to Auerochs' place and asked where Gabel was. Auerochs told him that Gabel had gone to Goss' office. Ortell said that the old man (meaning Looney) was going to "knock him off" to-night. He said Looney was out in the car. Auerochs did not go out and did not see Looney but saw the car. Ortell stayed about ten or fifteen minutes and Auerochs did not see him again that night. Gabel came back about 11:30, stayed about twenty minutes and said he was going home. Auerochs testified that no telephone

message was sent from Auerochs' place to Cox or Ginane. Auerochs learned of Gabel's death about twenty minutes after twelve.

According to the testimony of Helen VanDale somebody telephoned to her house about the time Gabel left Auerochs' place, inquiring if Cox was there, and to her question who was asking, answered, "Louie," in a voice which she recognized as Ortell's. She reported to Cox, who directed Ginane to take the message, and upon Ginane's return from the telephone he and Cox had a private conversation, and Ginane went out the back door of Helen VanDale's house to the space between her house and Gabel's. According to the testimony of Davis, Looney and his son were in that space and conferred with Ginane. Connor Looney came back to the car and by Looney's direction drove out of the alley. When Gabel drove up and stopped in front of his house and went around back of his car the large car which Mrs. Thorpe saw on the north side of Fourth avenue, between her house and Gabel's, must have been standing there. Persons occupying this car went back toward Gabel's car and shots followed immediately. Whether they were all fired by the persons who came from the car or by those persons and by other persons in the yard between Gabel's and Helen VanDale's places is not certain from the evidence, but the situation of the wounds on Gabel's body, entering from the right side and having. their exit from the front portion of his body, indicates that those shots, at least, came from the northeast, which was the direction of the persons between the two houses.

There is abundant evidence in the record to sustain the verdict of the jury. The greater part of it comes from corrupt sources. Most of the direct evidence connecting the plaintiff in error immediately with the crime comes from witnesses jointly indicted with him for the murder or fellow-conspirators in the unlawful combination out of which the murder grew. While their testimony must, as a

matter of law, be received with suspicion and acted on with great caution, it is nevertheless competent evidence, and a conviction of crime may be sustained on the uncorroborated testimony of an accomplice if it is of such a character as to convince the jury, beyond a reasonable doubt, of the guilt of the accused. A reasonable inference arises from the testimony of the accomplices who testified in this case that each of them was testifying under a promise of immunity or a reasonable hope that he would not be brought to trial for the crime or would be entitled to some leniency in consideration of his testimony. These are matters which go only to the question of the credibility of the witness and the weight to be given to his testimony. Of these questions the jurors are the sole judges. They have no right to reject without consideration any of the evidence which has been admitted as competent, but if, upon consideration of the testimony of any witness in connection with all the evidence in the case, they deem it unworthy of belief they have the right to reject it. The testimony of an accomplice is not necessarily to be rejected in every particular or in every particular in which it is not corroborated by other evidence. If such testimony were to be rejected as to all points not sustained by other evidence it would amount to a rejection of the testimony of accomplices altogether. If the testimony of an accomplice were to be accepted only as to such parts of it as were proved by other evidence in the case it would amount to a total rejection of the evidence of accomplices without consideration. Whether, under any circumstances, accomplices may be regarded as corroborating each other in their testimony we shall not consider. It is not essential to the application of the rule in regard to the corroboration of the testimony that the testimony should be corroborated in every particular. If the testimony is corroborated in material parts by respectable witnesses the jury may take that fact into consideration in weighing the testimony of the accomplices and in

determining to what extent the fact that the accomplice has testified truly in regard to some material matter justifies giving credit to other parts or all of his testimony.

The People called fifty-seven witnesses, of whom half a dozen testified to formal matters, only. About half of the witnesses were either accomplices or connected directly and more or less intimately with the conspiracy out of which grew the motive for the murder; ten of the others were policemen, two were night watchmen, Goss and Unger were prohibition enforcement agents, and others were engaged in different kinds of business, apparently respectable. The policemen corroborated the testimony of the accomplices and fellow-conspirators in regard to the relations of Cox, Looney, Helen VanDale, Gabel, Looney's control of the police and of police raids, the notification by Cox to keepers of saloons and disorderly houses previous to the service of the search warrants that Federal officers were in town, the withdrawal of the policeman on the night of the murder from the beat which included Gabel's premises, Looney's seeing Goss and Gabel together on Friday night just after Gabel gave the checks to Goss, his following Krueger around in his automobile on Saturday night before the murder, the location of the automobiles at the time of the murder and the directions in which they left the scene of the murder. It was the province of the jury to consider all the testimony given at the trial to determine the credit which should be given each witness and from such consideration and determination arrive at the truth. By their verdict they have said the evidence convinced them, beyond a reasonable doubt, that the plaintiff in error was guilty of the murder of Gabel, and we are satisfied of the correctness of their conclusion.

The evidence showing the development of the conspiracy for the protection of saloon-keepers and the keepers of disorderly houses included a great many transactions and criminal acts in Rock Island and Looney's connection

with them for several years before June 26, 1922, the date
of the beginning of the Grotto convention.   It is contended
that Looney had moved in 1912 to New Mexico, where he
had acquired a ranch, and that practically all his time was
spent in the west up to the time of the convention.   Docu-
mentary evidence was introduced which it is insisted shows
clearly that Looney was in the west almost continuously
during this time.   This evidence consisted of checks, let-
ters, telegrams, bills of lading, passports and other papers
between September 3, 1919, and June 15, 1922, concerning
which Looney testified as to where he was when he gave
them or received them.   In this way he located himself most
of the time in New Mexico, frequently in Colorado, and
sometimes in Nevada, Arizona, California, Mexico, Wash-
ington, Missouri, Iowa and Illinois.   He testified that when
he came close to Rock Island he visited that place.   He
was in St. Louis November 15 and November 17, 1919,
and August 27, 1920;  in Illinois on August 30, 1921;  in
Rock Island on March 22, June 6 to 9 and December, 1921,
April 18, 1922, before June 1, 1922, and again on June 26;
and in Illinois and Rock Island about a month in February
and March, 1922.   There were dates when no documents
were in evidence.   There is time not accounted for, and it
is apparent that he was in Rock Island frequently, and pos-
sibly more frequently than his testimony indicated.   The
value of the evidence depended largely on his testimony,
and it does not satisfactorily meet the evidence of his ac-
tivities in Rock Island during this period.   He also intro-
duced evidence, consisting of his own testimony and the
testimony of Mr. and Mrs. Charles Ulrich, that he was not
in Rock Island from early on Saturday evening, July 29,
1922, to about ten o'clock in the evening of July 30, but
was near Aurora, more than one hundred miles from Rock
Island, at the home of Mr. and Mrs. Ulrich and the latter's
father.   This testimony is contradicted by the evidence of
witnesses who testified that Looney was in Rock Island dur-

324—26

ing that time, and the credibility of the witnesses on either side of this issue was for the determination of the jury.

The plaintiff in error insists that it was erroneous to give instruction 9 at the request of the People because of the following language contained in it: "All who join in a common design to kill, whether in a sudden emergency or pursuant to a conspiracy, are liable for the acts of each of their accomplices in furtherance thereof, and the accomplices are so liable even though the perpetrator who actually commits the offense cannot be identified, if such act of killing is committed in pursuance of a common design to take the life of the deceased." It is argued that this clause states a proposition which is not applicable to the facts of the case, ànd that it told the jury that it was not necessary to prove who killed the deceased or how he came to his death. The instruction is not subject to the criticism. The first clause of the sentence objected to states the fundamental doctrine of the responsibility of accomplices in crime that they are liable for the acts of each of their accomplices in furtherance of the common design, and the second clause states the equally well settled rule that the accomplices are so liable, even though the perpetrator who actually commits the homicide cannot be identified, if the act of killing is committed in pursuance of the common design to take the life of the deceased. These rules are announced in *People* v. *Spies, supra,* and *People* v. *Rudecki, supra,* and were properly given to the jury.

The plaintiff in error asked, and the court gave, the following instruction:

"The court instructs the jury that if they believe from the evidence that any person was induced to become a witness and testify in this case by any promise of immunity from punishment or by any hope held out to him by anyone that it would go easier with him in case he disclosed who his confederate was or in case he implicated someone else in the crime, then the jury should take such facts into

consideration in determining the weight which ought to be given to his testimony thus obtained and given under the influence of such promise or hope."

The plaintiff in error then tendered seven instructions, each in the identical language of the one given, except that instead of the words "any person" in the one given, were substituted in the seven requested instructions the respective names of the seven co-defendants who testified for the prosecution. The general rule stated in the instruction given applies to all cases of the same kind. The object of instructing the jury is to inform them as to the rules of law applicable to the case, and when a rule has once been stated correctly it is not necessary to repeat it. For the same reason it was not necessary to give instruction 2, since it was a duplicate of instruction 26, which was given.

It is said that the plaintiff in error's refused instructions 11, 12, 13 and 14 should have been given and are not covered by other instructions sufficiently in cases of this nature. The principle contained in refused instruction 11 is contained in instruction 34, which was given. Instructions 12, 13 and 14 were on the subject of reasonable doubt, upon which, besides these three, the plaintiff in error requested instructions 16, 17, 18, 19 and 29, which were given and which contained all that was contained in the refused instructions and all that was necessary on the subject.

It is contended that the plaintiff in error's refused instruction 20 should have been given. It informed the jury that to justify a conviction the State must prove, beyond all reasonable doubt, all of the essential elements of the crime charged and stated those essential elements as follows :

"First—That William Gabel was murdered.

"Second—That John P. Looney willfully and wrongfully murdered William Gabel as charged in the indictment.

"Third—Or that the defendant John P. Looney entered into a conspiracy for the purpose of the murder of Wil-

liam Gabel, which conspiracy resulted in said murder by and through said conspiracy.

"Fourth—That the defendant John P. Looney at the inception and commencement of said agreement or conspiracy to murder was a party to the same or that with knowledge of the intent to murder, the object and means to accomplish it knowingly participated therein or knowingly co-operated with the murderer or murderers of William Gabel, if the murderer or murderers of William Gabel are proven by evidence beyond all reasonable doubt."

The instruction then continued: "If either one of these essential elements has not been proven to the satisfaction of the jury beyond all reasonable doubt by the evidence in this case, then it is the sworn duty of the jury to find the defendant John P. Looney not guilty." The instruction was properly refused, because the last clause of the fourth paragraph would be understood to require proof of the identity of the person who actually killed Gabel.

The judgment is affirmed.        *Judgment affirmed.*