(No. 19391.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GUST STAVRAKAS *et al.* Plaintiffs in Error.

*Opinion filed June 19, 1929—Rehearing denied October 5, 1929.*

572

W. W. O'Brien, (Clyde C. Fisher, of counsel,) for plaintiffs in error.

Oscar E. Carlstrom, Attorney General, John A. Swanson, State's Attorney, and James B. Searcy, (Edward E. Wilson, of counsel,) for the People.

Mr. Justice Duncan delivered the opinion of the court:

Plaintiffs in error, Gust Stavrakas and Peter Voulgaris, (herein called defendants,) were found guilty by a jury in the criminal court of Cook county under an indictment charging them with a conspiracy to injure and deface a building located in Chicago, designated as No. 262 North Crawford avenue, and certain fixtures in said building, to-wit, a certain glass window, owned by Samuel Levine. By their verdict the jury found their ages to be thirty-nine and thirty-six years, respectively, and fixed the punishment of each of the defendants at imprisonment in the penitentiary and a fine of $1000. After overruling their motions for new trial and in arrest of judgment the court sentenced each of them to serve an indeterminate term in

the penitentiary and to pay a fine of $1000 and the costs of prosecution, with a further provision that in case the fines and costs were not paid each defendant should "work out in the house of correction his fine and costs at the rate of $1.50 per day." The judgment of the court was affirmed by the Appellate Court for the First District. The record is brought here for review by writ of error.

The testimony of Socrates Kryiakoplos, of the age of twenty-six years, and of his father, James Kryiakoplos, of the age of sixty-one years, is in substance the following: They lived at 265 North Keystone avenue, in Chicago, and were engaged in the month of October, 1927, in the business of cleaning, dyeing and pressing clothes, hat-cleaning and blocking, and shoe-shining, in the lower story of the premises at 262 North Crawford avenue, in Chicago, and were tenants of Samuel Levine, who then owned those premises. Socrates Kryiakoplos and his father belong to a bootblacks' protective union that is affiliated with the American Federation of Labor, and Socrates is a director of that union. The two defendants belong to the Bootblacks' Protective Union of Illinois, but that union is not affiliated with the American Federation of Labor and the two organizations are rival unions. The defendant Stavrakas is president and the defendant Voulgaris is the business agent of their organization and claimed the right to collect dues from the members of the other organization. Some months before October 15, 1927, the defendants went to the place of business of Socrates and his father and had a conversation with the latter in which they tried to collect union dues from him, but he refused to pay dues to the defendants, saying that he belonged to the American Federation of Labor. Stavrakas claimed that he, as head of the bootblacks' union to which he belonged, had the right to collect dues from the Kryiakoplos firm, but James refused to pay such dues and the defendants went away. Socrates had known Stavrakas for five years or more and

had known Voulgaris for fifteen or sixteen years. James Kryiakoplos had known Stavrakas for about two years and had known Voulgaris for thirty years and knew him in Greece before they came to this country. On October 15, 1927, the defendants again came to the place of business of Socrates and his father and at that time Stavrakas said to the latter, "What are you doing here, old man? Now, don't you see you have a competitor across the street? You better move out." James Kryiakoplos told Stavrakas that he, James, had been there at his place of business for ten years and for him (Stavrakas) to go his way and mind his own business. Stavrakas said, concerning union dues, "Why do you pay the others and not me? They fool you and take your money away." As Stavrakas left the store he said, "You will think about that—about what you do and not pay dues." When Socrates and his father came to their place of business on Saturday morning, October 29, 1927, they found the plate-glass window in front of their establishment broken and found there a brickbat. The glass was 120 by 112 inches in size. It was cracked "all around," asterisk like, right from the center. The broken glass was replaced with a new one on that day.

Socrates Kryiakoplos further testified as follows: He and his father closed their place of business on the night of October 29, 1927, at 10:30 o'clock. He remained on watch in the building with a gun. About 3:00 o'clock on Sunday morning, October 30, 1927, two men drove up in front of his store in a Ford coupe and stopped at the curb. Voulgaris, one of the men in the coupe, got out of the automobile and threw a brick against the front window glass, which had been put in the day before, and broke it. That glass was of the value of $120. He also recognized Stavrakas as the man at the steering wheel of the Ford coupe. When the glass was broken the witness ran out onto the sidewalk with his gun but did not fire. He further testified that he took the license number of the automobile; that

there was a street lamp across the street a short distance south of the witness' place of business. After the indictment against the defendants was returned by the grand jury he had a conversation with Voulgaris, whom he met in front of the restaurant across the street from his place of business. Voulgaris asked him why he had him (Voulgaris) indicted. They crossed the street together, and in the presence of his father the witness told Voulgaris that he was surprised that he (Voulgaris) would break out his window. Voulgaris was in a bad humor and began to swear, and the witness asked him to leave. Voulgaris also told the witness he would be sorry for what he had done. A week before the trial Stavrakas called the witness on the telephone and told him "to lay off the case," and that if he "went through" he "would get in." The witness asked what was meant by "get in," and the connection on the telephone was then broken.

The testimony of Gust Trakas and Bill Zanis, witnesses for the defense, was to the effect that they were at a restaurant at 717 South Halsted street, in the city of Chicago, on Saturday night and early Sunday morning, October 29 and 30, 1927. Voulgaris was with them, and according to Trakas did not leave until after 3:00 o'clock in the morning, and according to Zanis was there with them from 11:00 P. M. until 4:00 A. M. They both fixed the time they were at the restaurant, because they customarily went there to play pinochle every Saturday night. Neither one of them claimed to have looked at a timepiece to fix the hour that they left, and Zanis testified that he did not do so, although he stated that Voulgaris left at 4:00 o'clock. Both of them also testified that they saw a lot of other people there on that night but could not give the names of any of them.

Voulgaris testified that he was in the cleaning and dyeing, hat-cleaning and shoe-shining business and was a collector for the Bootblacks' Protective Union of Illinois. He

denied having any connection with or part in the breaking of the window glass in the place of business of the complaining witnesses, and stated that he was with witnesses Trakas and Zanis in a restaurant at 717 South Halsted street on the morning of October 30, 1927, from 1:00 until 4:00 o'clock. He testified that the shoe-shining shop across the street from the place of business of the complaining witnesses was owned by Harry Mangus, who did not belong either to the union with which the witness was connected or the union to which the complaining witnesses belonged. He also testified that he was at the place of business of the complaining witnesses to ask for union dues six months before the trial and also in October, 1927, but that he was never present when anyone threatened them, and, that he did not go with Stavrakas in an automobile to their place of business on the morning of October 30.

Stavrakas testified that he was in the shoe-shining and hat-cleaning business. He denied having any connection with or part in the breaking of the window in the place of business of the complaining witnesses or ever having had any trouble with either of them. He had asked James Kryiakoplos for union dues, but he refused to pay them, saying he had joined another union. The witness testified that he was at home with his wife and children on the morning of October 30, 1927; that he went home when he closed his place of business at 11:00 o'clock P. M. Saturday and stayed at home all night, and that he had never driven a Ford car but could drive any car except a Ford.

Alfred Mrotz, a police officer, testified that he talked to Socrates Kryiakoplos in the latter part of October, 1927, about the window having been broken out. Socrates at that time told the witness the window had been broken before. He also said that he was not sure who had broken it, but thought that the man across the street had. Socrates Kryiakoplos, in rebuttal, testified that he had purposely told officer Mrotz that he was not sure who had broken out the

window, because Voulgaris had been a very intimate friend of him and his family and he did not want to implicate Voulgaris; that on the following Friday he saw the defendants together across from his place of business, and he thought his window would be broken again or his place of business damaged by an explosion, and he asked the police for protection and told them who had broken the window on October 30.

It is contended by the defendants that the proof fails to establish that the building damaged was owned, on the date of the offense, by Samuel Levine, as alleged in the indictment. The only evidence bearing on this question is that of Socrates Kryiakoplos. He testified that he was in business with his father at the place aforesaid; that they rented the room occupied by their business establishment from Samuel Levine; that Levine owned the building, and that he, the witness, was a tenant there on October 30, 1927. No objection was made to that evidence and no question was raised in the trial court as to the ownership of the building. In the absence of any such question being raised on the trial, this evidence must be considered sufficient to establish the ownership of the damaged building in Samuel Levine on the date of the offense.

The evidence tended to show that the window broken was replaced by an insurance company and that the prosecuting witnesses carried the insurance. It is urged that from this showing there was no damage to the building so far as the owner was concerned, and that therefore the judgment should be reversed. This contention is without merit. The crime with which the defendants were charged and of which they were convicted is conspiracy to injure a building owned by Samuel Levine. It was not essential to establish that the object of the conspiracy was accomplished in order to warrant a conviction. (*People* v. *Lloyd,* 304 Ill. 23; *Gallagher* v. *People,* 211 id. 158; *Ochs* v. *People,* 124 id. 399.) Furthermore, the conspiracy charged was

conspiracy to injure a building,—not to injure the owner of a building,—and the fact that the injury to the building would cause or did cause no pecuniary loss to the owner thereof is immaterial.

It is contended that the trial judge assumed the role of prosecutor and judge, unduly restricted the cross-examination of witnesses for the State by the attorney for the defendants, and by his remarks and conduct intimated to the jury that he thought the defendants were guilty. We find from an examination of the record that the trial judge often interrupted the attorneys both for the State and the defendants in the examination of witnesses and at times interrogated witnesses himself, and that a great many remarks were exchanged between the attorneys and the trial judge. The record does not disclose, however, that the judge was biased or that by his conduct he led the jury to believe that the verdict should be guilty. He interrupted the State's attorney as much as he did the attorney for the defense, and it does not appear that the cross-examination of the State's witnesses was unduly restricted. After the case had been closed and was being argued before the jury the judge allowed the defendants to introduce the testimony of officer Mrotz, whom they had been unable to get into court before that time. That action of the judge did not indicate that he was prejudiced against the defendants or wanted to treat them unfairly, and we do not find anything in the entire record that so indicates or that indicates that his conduct was prejudicial to the defendants in their trial.

The defendants also urge that it was error to permit Socrates Kryiakoplos to testify that the union that the defendants represented was not affiliated with the American Federation of Labor, and that the two unions were rival unions. The theory of the State was that the motive for the crime was the refusal of the complaining witnesses to pay dues to the union represented by the defendants because they belonged to a different and rival union. It was

proper to show the difference between the unions and that they were rival unions. Proof of motive is always proper in a criminal case. *People* v. *Looney,* 324 Ill. 375; *People* v. *Wolf,* 334 id. 218.

It is further contended by the defendants that the court gave erroneous instructions at the request of the People. One of those erroneous instructions informed the jury that the reasonable doubt to authorize a verdict of not guilty must be upon the whole evidence and not as to any particular fact in evidence. It is not necessary, as the instruction states, to prove beyond a reasonable doubt every fact that may be relied on by the prosecution as tending to show the guilt of the defendants if the words "every fact" refer merely to evidentiary facts, but it is always essential that every ultimate fact be proved beyond all reasonable doubt. If all the evidence in the case leaves a reasonable doubt in the minds of the jury as to any fact necessary to constitute the crime charged in the indictment, then the proof is insufficient to warrant a verdict of guilty. (*People* v. *Johnson,* 317 Ill. 430.) Such necessary fact is an ultimate fact and must be distinguished from an evidentiary fact, which jurors might not in all cases be able to do. The only question that the jury had to decide in this case that was really determinative of the question of the guilt of the defendants was whether or not they were the persons who broke the window in front of the place of business of the prosecuting witnesses on October 30, 1927. The jury were fully instructed upon the part of the defendants, and in view of all the instructions in the case could not have been misled by the giving of this instruction or of any other instruction found in the record. The cause, therefore, should not be reversed merely because the jury were not instructed so as to inform them in said instruction of the difference between an ultimate and an evidentiary fact, as they were sufficiently informed by other instructions that if all the evidence in the case leaves a reasonable

doubt as to the defendants' guilt the proof was insufficient to warrant them in returning a verdict of guilty.

The existence of a conspiracy may be proved not only by direct evidence but as well by inference from the conduct, statements and other facts and circumstances which disclose a common design on the part of the accused and others to act together in pursuance of a common criminal purpose. (*People* v. *Looney, supra.*) The defendants in this case do not dispute the fact that the union to which they belonged was a rival union of the one to which the complaining witnesses belonged. They admit that they tried to collect dues from the prosecuting witnesses more than once and that they refused to pay such dues. There is no specific denial by Stavrakas in his testimony that he used the threatening language that the prosecuting witnesses say he did when he was trying to collect dues. He did specifically deny that he called Socrates Kryiakoplos on the telephone and said to him the threatening words that Socrates testified he used in a telephone conversation, but he confines his denial to the specific charge that he drove an automobile to the place of business in question the night the window glass was broken. The question of guilt in this case is peculiarly one for the jury to decide, and if the jury believed the testimony of Socrates, to the effect that he saw Voulgaris break the window glass with a brick and that the other defendant was with him at that time, this evidence, together with the other facts proved and admitted, would be sufficient proof of the guilt of the defendants.

The jury were correctly instructed as to the form of their verdict in case the punishment of the defendants should be fixed at imprisonment in the penitentiary and a fine, and the jury found them guilty and fixed their punishment at imprisonment in the penitentiary and a fine, in accordance with that instruction. (*People* v. *Graves,* 304 Ill. 20; *People* v. *Lloyd, supra.*) It is therefore immaterial

that the court improperly instructed the jury as to the form of their verdict in case they did not fix the punishment of the defendants at imprisonment in the penitentiary and a fine.

It is further contended by the defendants that the court erred in stating in its sentence of the defendants that if at the expiration of their term of imprisonment the fine and costs so imposed should not be paid, that then the amount of such fine and costs should be worked out by the defendants in the house of correction at the rate of $1.50 per day. In their argument the defendants referred to the second section of the Parole act, which provides that no person shall by any court be committed to the penitentiary, reformatory or other State institution for the recovery of a fine or costs. It is a sufficient answer to this argument that the house of correction of Cook county is not a State institution. The sentence of the court was not erroneous for the reason suggested by the defendants' counsel.

It is also suggested by counsel that the clause, "or other State institution," should be construed to include any place of incarceration in the State of Illinois. We do not think that said provision of the statute is susceptible of that construction. The evident intention of the legislature by said provision of the statute was to prevent a defendant's sentence to the penitentiary, reformatory or other State institution being extended by compelling him to submit to further imprisonment to pay his fine and costs. This is shown to be the true construction of that section by reason of other provisions of the Criminal Code. One of such provisions is that of section 10 of division 14 of the Criminal Code, which provides that "any person convicted, in a court of this State having jurisdiction, of any crime or misdemeanor, the punishment of which is confinement in the county jail, may be sentenced by the court in which such conviction is had, to labor for the benefit of the county, during the term of such imprisonment, in the work-

house, house of correction, or other place provided for that purpose by the county or city authorities." It will be noted by the provisions of section 10 that they are not applicable to any person convicted, in a court of this State having jurisdiction, of any misdemeanor the punishment of which is confinement in the penitentiary, State reformatory or other State institution. By the provisions of section 168*b* of the Criminal Code (Hurd's Stat. 1921, p. 1106,) it is provided that any person convicted of petit larceny, or any misdemeanor punishable under the laws of this State in whole or in part by fine, may be required by the order of the court of record in which the conviction is had, "to work out such fine and all costs, in the workhouse of the city, town or county, or in the streets and alleys of any city or town, or on the public roads in the county, under the proper person in charge of such workhouse, streets, alleys, or public roads, at the rate of $1.50 per day for each day's work." This latter section of the statute is applicable to the offense of which the defendants are convicted. The statute under which they are punished imposes punishment in part by fine and in part by a penitentiary sentence as one of the penalties for the crime of conspiracy. The crime of conspiracy, for which the defendants are convicted, is a misdemeanor. A felony, under our statutes, is an offense punishable with death or by imprisonment in the penitentiary, while every other offense is a misdemeanor. When the offense may be punished by imprisonment in the penitentiary, or by fine only, or by punishment in the penitentiary and by fine, in the discretion of the court or jury, it is only a misdemeanor. (*Lamkin* v. *People,* 94 Ill. 501; *Baits* v. *People,* 123 id. 428.) The provisions of section 168*b* of the Criminal Code are therefore clearly applicable to the charge against the defendants in this case.

The court in sentencing the defendants to work out their fine at the rate of $1.50 per day in the house of correction in case they did not pay their fine did not commit

error except in using the term "house of correction" in place of the term "workhouse." If the city of Chicago or the county of Cook did not have a workhouse as distinguished from a house of correction the court did not commit error, as the provisions of sections 5, 10 and 13 of chapter 67, entitled "Houses of Correction," indicate that a house of correction is a place of work for criminals having to work out their fine. If Cook county had a workhouse and also a house of correction the judgment and sentence of the court would be erroneous because of the fact that the sentence of the defendants was to the house of correction. We assume, however, that the court's sentence was correct and that the house of correction was the only workhouse in Cook county.

The defendants' contention that the judgment should be reversed on the facts cannot be sustained. The trial judge, who heard and saw the witnesses testify, approved the verdict. The judgment of the criminal court has been affirmed, after a review of the record, by the Appellate Court. In the record the evidence for the People amply supports the findings of the jury and of the lower courts. It is not the purpose of a court of review to determine whether or not a record is free from error, but rather to determine whether or not the accused has had a fair trial under the law and whether his conviction is based upon evidence establishing his guilt beyond a reasonable doubt. It is not the practice of this court to reverse a judgment because some error may have been committed by the trial court, unless it appears that real justice has been denied thereby or that the verdict of the jury or the judgment of the court may have resulted from such error. *People* v. *Murphy*, 276 Ill. 304.

There is no reversible error in the record, and the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*